IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| LAWRENCE CARTY, et al., | : | Civil No. 94-78 |
| Plaintiffs, | : | **OPINION IN RESPONSE TO FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING DEFENDANTS' COMPLIANCE WITH THE MENTAL HEALTH AND CORRECTIONS REMEDIES** |
| v. | : | |
| JOHN DEJONGH, et al., | : | |
| Defendants. | : | |

**APPEARANCES:**

Eric Balaban, Esq.
ACLU National Prison Project
1875 Connecticut Avenue NW, Suite 410
Washington, DC 20009
    Attorney for Plaintiffs

Benjamin C. Currence, Esq.
Norre Gade, 2nd Floor #12
P.O. Box 6143
St. Thomas, USVI 00804-6143
    Attorney for Plaintiffs

Vincent Frazier, Esq.
Attorney General of the V.I.
Department of Justice
48-B 50C Kronprindsens Gade
GERS Building, 2nd Floor
St. Thomas, USVI 00802
    Attorney for Defendants

Richard Schrader, Esq.
Assistant Attorney General
Department of Justice
6040 Castle Coakley
Christiansted
St. Croix, USVI 00820
    Attorney for Defendants

# I. Relevant Background and Procedural History

On June 20, 1994, Plaintiffs, a class comprised of pre-trial detainees and inmates, filed their class action suit alleging that the conditions in the Criminal Justice Complex ("CJC") and the Criminal Justice Complex Annex ("Annex") in St. Thomas, USVI (collectively referred to as "the jail") were unconstitutional due to inhumane and dangerous conditions that the inmates were subjected to while housed in the jail. Defendants to the suit include various Virgin Islands officials including the Governor, Attorney General, Director of the Bureau of Corrections ("BOC"), the CJC's Warden and Assistant Warden, and others. Individuals currently filling those roles are as follows:

- John DeJongh is the Governor of the Virgin Islands.
- Vincent Frazier is the Attorney General.
- Julius Wilson is the BOC director. He has held that position since October 1, 2008. The position had been vacant for eleven months prior to his appointment.
- Hilary Herman is the Assistant Director.
- Everette Hansen has been the warden of the CJC and Annex since August 2008 (replacing Agnes George who held that position for eleven years).

The CJC is located on the third floor of the building known as the Alexander Farrelly Criminal Justice Complex. That building also houses the Virgin Islands Police Department on its first and second floors. Pursuant to the Agreement, the CJC's population is capped at its rated capacity of 97 prisoners. Typically about 80% of those prisoners are pre-trial detainees. Those prisoners who are not pre-trial detainees normally have less than one year remaining on their sentences.

There are seven housing clusters which hold ten to twenty prisoners each. Some are general population but three hold particular subsets of detainees: Cluster 3 houses mentally ill prisoners; Cluster 6 houses some, but not all, new admissions and prisoners in administrative or disciplinary segregation; Cluster 7 houses female prisoners. It should be noted that though Cluster 3 is designated for mentally ill prisoners, the unit sometimes houses prisoners who are not mentally ill and also sometimes mentally ill prisoners are housed in general population.

On October 12, 1994, the parties signed a Settlement Agreement (the "Agreement"), which this Court entered as an Order on December 7, 1994. Pursuant to the agreement, Defendants are required to make specific improvements relating to the operations and conditions of the jail in order to bring the facility up to minimal constitutional standards. Throughout the subsequent course of this litigation, this Court has issued many remedial orders that would require Defendants to make additional improvements at the jail.

In certain instances, the Defendants have fallen short of their court ordered requirements, requiring this Court to, on four separate occasions, hold Defendants in contempt of the Settlement Agreement:

1. 1997: This Court issued an order stating that Defendants have not made adequate efforts to remedy the conditions at the CJC that were not up to basic habitability standards.[1]

2. 2001: This Court held Defendants in contempt as to the issues of shelter, physical plant, environmental health, preventative maintenance, hygiene items, mattresses, fire safety, medication distribution, legal access,

---

[1] *Carty v. Farrelly*, 957 F. Supp. 727, 743 (D.V.I. 1997).

3

telephones, security systems, and Annex construction.² The Defendants were then required to establish a remedial account to control all funds for the housing of federal detainees in BOC facilities.³

3. 2003: This Court found Defendants in contempt of many provisions of the Agreement and subsequent remedial orders.⁴ This contempt citation is still in effect.

4. 2007: Subsequent to findings made after analysis of the jail and report by Jeffrey Metzner, M.D., a forensic psychiatrist and expert in correctional mental health care systems, the Court found Defendants in contempt of numerous health care provisions of the Agreement and remedial orders.⁵

Pursuant to this Court's order of February 21, 2008,⁶ Plaintiffs retained corrections expert Steve Martin to make an inspection of the facilities and then prepare an expert report analyzing the management and leadership of the BOC and also the conditions of security and corrections at the CJC and the Annex.

This Court has been supervising the Settlement Agreement pursuant to the Prison Litigation Reform Act (PLRA), 18 U.S.C. § 3626 *et seq.* On January 12, 2009, Defendants filed a

---

²*Carty v. Turnbull*, 144 F. Supp. 2d 395, 399-416 (D.V.I. 2001).

³Ordered October 29, 2001.

⁴*See Carty v. Turnbull*, Civil No. 94-78, (D.V.I. May 28, 2003) (Findings of Fact and Conclusions of Law on Contempt Motion).

⁵*Carty v. Turnbull*, 2007 WL 817607, (Feb. 27, 2007).

⁶Docket No. 542.

motion to terminate the consent degree and remove the court supervision.[7] Subsequently, this Court filed a scheduling order setting forth discovery deadlines and a date for a hearing.[8] Defendants did not comply with certain deadlines, which lead to this Court ruling that the Defendants would not be permitted to present at the eventual termination hearing anything regarding either evidence contradicting that of the findings of Plaintiffs' experts or of any remedial efforts taken since the experts' tour of the CJC and Annex.

Even though Defendants filed a notice to withdraw their motion to terminate,[9] this Court still held evidentiary hearings on May 28, 2009 and June 2, 2009 so that Plaintiffs' experts Dr. Metzner and Mr. Martin could testify. At the hearings, this Court permitted the Defendants to withdraw their motion to terminate. The hearings were concluded by this Court ordering that the parties shall submit briefs regarding Defendants' compliance thus far and also suggesting what additional remedies should be undertaken to finalize these proceedings and bring the operation of the CJC and Annex up to constitutional standards.[10]

**Management Issues**

Part of the Settlement Agreement requires that Defendants establish policies and procedures to govern the operation of the jail, most importantly security procedures including instructions on proper implementation of any security procedures. Defendants have recently begun to show proof of compliance but to date there has been no official audit to determine the

---

[7]Docket No. 555.

[8]Docket No. 580.

[9]Docket No. 602.

[10]Docket No. 610.

outstanding deficiencies in order to correct them. Defendants must perform an official analysis of the deficiencies and then from that, create a complete and inclusive task list of all deficiencies that must be resolved.

From what this Court has seen, an unofficial, incomplete list of deficiencies can be cobbled together from various sources, but there must be an official accounting of what must be cured in order for real change to occur.

As it stands, the following is a list of examples of alleged deficiencies which in no means shall be considered complete, but rather was compiled from various documents filed by the parties.

- Cellblock and control panels at both facilities do not function properly
- A cellblock in the Annex has two cells with inoperable locking mechanisms
- Officers in an Annex cellblock had no radios and inoperable phones
- Facilities are operating without a comprehensive and updated operations manual
- No inmate classification system
- No information management system
- No monthly reports
- Lacking a functional record keeping system
- No checks against officer misconduct or alleged use of excessive force
- No effective procedures to control contraband

**Other Major Deficiencies** (as detailed in Plaintiffs in their Findings of Fact and Conclusions of Law Regarding Defendants' Compliance with the Mental Health and Corrections Remedies):

- **Insufficient Staffing and Training:** Housing officers fail to conduct the required fifteen minute checks of housing units; Basic security functions not being carried out; Understaffing resulting in unsupervised units or clusters; Officers often required to work double shifts; No complete staffing plan; Officers provided little or no in-service training.
- **Security Systems:** No preventative maintenance programs for mechanical systems and physical plant; Understaffing of maintenance workers; improperly maintained door locking mechanisms, control panels, and intercom systems; prisoner ability to pop the locks on cell doors; Insufficient closed circuit monitoring system.
- **Prisoner Classification:** Lack of established objective classification system; no system to separate known enemies; No active management of control of prison population numbers; Inadequate work programs for sentenced and long-term detainees.
- **Use of Force and Restraints:** Lack of proper use of force policy; Undocumented use of force.
- **Management of Special Needs Offenders:** Failure to establish protective custody and segregation cells; Insufficient treatment personnel; Limited intake screening; Lack of policies regarding management of special needs offenders; Lack of officer training regarding management of special needs prisoners.
- **Prisoner Disciplinary and Segregation Practices:** Arbitrary disciplinary system with few procedural protections; Poor documentation of practices; Orientation

handbook describing disciplinary process and institutional rules not regularly distributed to prisoners.

- **Grievances:** Most prisoner grievances do not receive official response; no formal mechanism in place to ensure reliable grievance system.
- **Legal Access and Telephones:** Inadequate access to law library; Library at CJC does not contain updated volumes; Annex inmates have no access to law library; Limited telephone access to make confidential telephone calls to attorneys.
- **Annex Mental Health Staff and Policies:** No dedicated mental health staff to service Annex inmates; No policies and procedures in place to identify and exclude mentally ill prisoners.
- **Nursing Staffing:** Inadequate staffing; Unfilled nursing staff positions.
- **Healthcare Staffing Plan:** No comprehensive staffing plan; Staffing vacancies.
- **Medical Leadership and Policies and Procedures:** Inadequate staffing of Health Care Coordinator position; No monthly health care meetings; No mental health services budget; Inadequate hiring process.
- **Intake Screening including Screening Form and Management Information System (MIS) and Screening Process:** No revised intake evaluation form; No officer training for completing intake evaluations; No management information system to record intake screening process data; Inadequate mental health evaluation at screening process
- **Mental Health Services including Psychiatric Services and Mental Health Specialist:** No mental health referral system; Inadequate psychiatric follow-up

8

care; No process for mental health assessments subsequent to disciplinary infractions; Need to hire a master's level mental health specialist to conduct initial mental health evaluations and continued care.

- **Medical Charts:** No standardized charting practices; No medical records technician; No computerized medical records system.
- **Medical Health Housing:** Inadequate housing area for prisoners requiring mental observation.
- **Seclusion, Restraints & Suicide Precautions:** Inadequate training and precautions for suicide prevention.
- **Acute Referrals & Hospitalization:** Lack of emergency mental health intervention referrals to outside medical facilities.
- **Forensic Facility:** Inadequate long range plan/ failure to follow through with fulfilling needs for forensic unit to house mentally ill prisoners.
- **Quality Assurance Program:** Failure to implement a Quality Assurance program to measure staff performance in delivering health services.
- **Medications:** No in-house formulary; Inadequate medication administration and monitoring.
- **NGRI Inmates:** Improper handling and housing of persons who have been found not guilty by reason of insanity (NGRI).

Defendants were to have reached full compliance with the remedial provisions of the 1994 Agreement by January 1, 1996, over fourteen years ago. Despite numerous contempt findings by this Court, Defendants have yet to fully comply. The time for compliance is now.

Defendants must take immediate and serious action to improve the conditions of the facilities.

Plaintiffs have done a more than adequate job of detailing the past and present deficiencies at the facilities but what is needed is a conclusive and comprehensive list of remedial tasks that must occur. Rehashing the Defendants' non-compliance yet once again does nothing to correct the problems. The parties must look to the present and the future, and begin final resolution of this matter. Defendants' must produce a comprehensive list of actions that they are and will be performing to efficiently and permanently correct the deficiencies, and then swiftly implement those actions.

## II. APPLICABLE LAW

The constitutional rights of a prisoner are violated when it can be shown that the prisoner is incarcerated under conditions that pose substantial risk of serious harm to their health or safety and that the officials acted with deliberate indifference to the risks. *Farmer v. Brennan*, 511 U.S. 825, 839-840 (1994). Furthermore, unsafe conditions that "pose an unreasonable risk of serious damage to [a prisoner's] future health" may be constitutional violations even if not actual damage has yet occurred. *Helling v. McKinney*, 509 U.S. 25, 33 (1993). Fundamental to the Eighth Amendment is the notion that prisoners are not to be treated as less than human beings. *Spain v. Procunier*, 600 F.2d 189, 200 (9th Cir. 1979) (citing *Furman v. Georgia*, 408 U.S. 238, 271-273 (1972) (J. Brennan, concurring)) ("The [Eighth A]mendment is phrased in general terms rather than specific ones so that while the underlying principle remains constant in its essentials, the precise standards by which we measure compliance with it do not.")

Prison inmates have a constitutional right to receive adequate treatment for serious medical conditions, including psychiatric conditions. *Colburn v. Upper Darby Township*, 838

F.2d 663, 669 (3d Cir. 1988), *overruled on other grounds by Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163 (1993). For inmates to establish a constitutional claim for deficient care, they must demonstrate that the prison officials acted with deliberate indifference to their serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). The standard of care required is the same for both physical health concerns and mental. *Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987). A serious medical need is an illness or injury that has either been diagnosed by a medical professional or "one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth*, 834 F.2d at 347. A serious medical need is shown by either a professional diagnosis or substantial suffering. See Goodrich v. Clinton County Prison, 214 Fed. Appx. 105, 111 (3d Cir. 2007).

## III. CONCLUSION

This Court concludes that Defendants must once and for all resolve the deficiencies swiftly and fully. On July 15, 2010, Defendants shall submit a detailed progress report to this Court and to Plaintiffs outlining specifically both their present efforts to comply with the provisions of the Agreement and other remedial orders, and also outlining their future course of action to remedy any and all deficiencies. Subsequent to that initial progress report due on July 15th, 2010, Defendants shall update the Court by providing an updated progress report every two months for the next six months, on the following dates:

- September 15, 2010
- November 15, 2010
- January 15, 2011

Finally, by January 15, 2011 the parties shall submit a proposed final Settlement Agreement. The Court will then schedule a final hearing regarding the Settlement Agreement so that this matter may finally come to a close.

The parties are encouraged to work together to craft remedial measures that will respond effectively to identify constitutional violations. All attempts should be made to provide the Court with a joint proposed remedial order that connects the continuing injustices and establishes a time-frame for final termination of the court's jurisdiction over this matter.[11]

Dated: May 17, 2010

HONORABLE STANLEY S. BROTMAN
United States District Judge
(Sitting by Designation)

---

[11] For example, see the procedure filed in Martin Harris v. The City of Philadelphia, Civil Action No. 82-1847, 2000 U.S. Dist. LEXIS 15279, decided August 30, 2000; and in Ruiz, et al. v. Johnson, et al., Civil Action No. H-78-987, 2001 WL 737338 (S.D. Tex.), decided June 18, 2001.