**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN**

|  |  |  |
|---|---|---|
| LAWRENCE CARTY, et al., | : | Civil No. 94-78 |
|  | : |  |
| Plaintiffs, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| ALBERT BRYAN, et al., | : |  |
|  | : |  |
| Defendants. | : |  |

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION FOR PROTECTIVE ORDER**

Plaintiffs, by and through undersigned counsel, hereby respond to Defendants' Motion for Protective Order (DE 1088).

Defendants have moved for a protective order under Fed. R. Civ. P. 26(c)(1) for the following relief:  (1) requiring Plaintiffs to take down security video footage of a July 2018 excessive use of force incident from the ACLU's professional website, and (2) barring the dissemination of any other videos of incidents at the St. Thomas Jails to third parties, including those presented as evidence in this case.  (DE 1088).

This case addresses issues of significant public concern and interest. It has garnered extensive public attention and local and national press coverage since it was filed 25 years ago. *See* Ex. A, filed herewith (selected press coverage of this case including by *Slate,* National Public Radio, and the *Virgin Islands Daily News*).  Defendants now seek to bar the public from access to critical evidence that goes to the heart of the unconstitutional and life-threatening conditions that endure at the Criminal Justice Complex.  Videos of assaults, fires, and serious security breaches have been played in open court in this case throughout its pendency.  One of

1

those videos has been hosted by the *Virgin Islands Daily News'* website for close to three years. Defendants did not raise a security-based objection to any of them. Now, 25 years in, Defendants finally object, raising security concerns. They do so three weeks after the Court overruled their security-based objection at the last hearing to a video of a recent beating by an officer of a seriously mentally ill prisoner. Their renewed objection is no more valid today than it was last month. For the reasons set forth below, Defendants' motion should be denied.

## I.   Defendants' Motion Must Be Denied Due to Their Failure to Confer.

Defendants' motion does not include the required "certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action." Fed. R. Civ. P. 26(c)(1). The Local Rules similarly require the moving party to certify it has conferred with opposing counsel before filing a motion for protective order. *See* LRCi 37.1. Under LRCi 37.2(c), "[t]he Court will not consider any discovery motion in the absence of" a joint stipulation from the parties or declaration from counsel for the moving party that opposing counsel refused to meet and confer. Further, Defendants' failure to comply with LRCi 37 warrants the imposition of sanctions. *See* LRCi 37.3. Defendants' failure to certify that they met and conferred—or even attempted to meet and confer—with Plaintiffs regarding their motion for a protective order requires that their motion be denied with prejudice.

## II.   Defendants Waived Their Objection to the July 2, 2018 Video Played in Open Court.

Defendants seek an Order requiring Plaintiffs to remove the July 2, 2018 video of the altercation between CO Jamal Crooke and prisoner Benjamin Hodge from the ACLU's professional website. (DE 1088 at 1). Defendants waived their objection to the publication of this video, since they failed to object to its being shown in open court.

The July 2, 2018 video was shown in court at a public hearing on November 28, 2018. *See* Ex. B, filed herewith (excerpts of Nov 28, 2018 hearing tr. at 90:23-94:10 (Mullgrav)). The contents of the video were covered extensively by local press.[1] Defendants did not object to the video being shown in open court. *See* Ex. B. They did not ask that the monitors available to the public at the hearing be turned off. *Id.* They raised no objection to the use of the video after the hearing until filing the instant motion over two months later.

An order barring the ACLU from hosting the July 2, 2018 video on its website implicates free-speech and free-press rights. The freedom of the press "is not confined to newspapers and periodicals," but "comprehends every sort of publication which affords a vehicle of information and opinion." *Branzburg v. Hayes*, 408 U.S. 665, 704 (1972) (citations omitted). The public also has a constitutionally protected right to receive publishers' work because the "freedom of speech necessarily protects the right to receive" speech, and the First Amendment thus extends to the right to "receive information and ideas." *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976) (internal quotations omitted); *see First Nat'l Bank of Bos. v. Bellotti,* 435 U.S. 765, 783 (1978) ("the First Amendment goes beyond protection of the press and self-expressions of individuals to prohibit government from limiting the stock of information from which members of the public may draw."); *ACLU v. Alvarez,* 679 F.3d 583, 597 (7th Cir. 2012) (invalidating application of Illinois eavesdropping statute against ACLU for recording and publishing police encounters, citing *First Nat'l Bank*). That is, the protection is

---

[1] *See* "*Report:  V.I. Still Letting Mentally Ill Inmates Suffer," Virgin Islands Daily News,* Dec. 3, 2018, *available at* http://www.virginislandsdailynews.com/news/report-v-i-still-letting-mentally-ill-inmates-suffer/article_d5efa9a8-0b53-56ce-b76a-e7b851dbb191.html*; "Police Report Progress on Consent Decree; Corrections Still Faces Challenges," St. Thomas Source,* Nov. 29, 2018, *available at* https://stthomassource.com/content/2018/11/29/police-report-progress-on-consent-decree-corrections-still-faces-challenges/

afforded "to the *communication*, to its source and to its recipients both." *Va. State Bd. of Pharm.* at 756 (emphasis added).

It is well established that First Amendment protections extend to those who have published lawfully obtained information that has been revealed in court proceedings.  *See Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 496 (1975) ("Once true information is disclosed in public court documents open to public inspection, the press cannot be sanctioned for publishing it.").  This is true even where the court generally had the power to restrict dissemination of the information in the first instance.  *See Okla. Pub. Co. v. District Court In & For Oklahoma Cty*, 430 U.S. 308, 311 (1977) (per curiam) (striking down order barring publication of the identity of a juvenile defendant obtained by a reporter's attending a court proceeding, even though courts may generally protect the identity of juveniles.); *Cox Broadcasting Corp.*, 420 U.S. 469 (the government may not sanction a news organization that accurately published a rape victim's name obtained from judicial records open to public inspection); *Florida Star v. B.J.F.*, 491 U.S. 524, 533-36 (1989) (invalidating a state law that prohibited the dissemination of the names of rape victims and declaring that the government cannot proscribe the publication of "lawfully obtain[ed] truthful information about a matter of public significance"); *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 103-4 (1979) (invalidating a state law prohibiting a newspaper from publishing the identity of a juvenile defendant and stating that "if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information" absent an extraordinary countervailing state interest) (internal quotations omitted).

The Third Circuit has held that "[i]t is well established that the release of information in open court is a publication of that information and, if no effort is made to limit its disclosure,

operates as a waiver of any rights a party had to restrict its future use." *Litttlejohn v. Bic Corp.,* 851 F.2d 673, 680 (3d Cir. 1988).

As Defendants did not object to the video being shown in a public hearing, they have waived their right to lodge their objection now.  The Virgin Islands government cannot bar via court order the July 2, 2018 video's re-publication on the ACLU's website.  "The  First . . . Amendment[] will not permit a . . . court to prohibit the publication of widely disseminated information obtained at court proceedings which were in fact open to the public." *See Okla. Pub. Co.*, 430 U.S. at 310.

### III.    Defendants' Takedown Request is an Unconstitutional Prior Restraint.

Where material has already been posted, an order demanding that it be removed from the Internet constitutes a "classic prior restraint of speech." *Garcia v. Google, Inc.*, 786 F.3d 733, 747 (9th Cir. 2015) (quoting *Alexander v. United States*, 509 U.S. 544, 550 (1993), which held that "[t]emporary restraining orders and permanent injunctions — i.e., court orders that actually forbid speech activities — are classic examples of prior restraints").

"[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 559 (1976).  Indeed, the Supreme Court has held that "it has been generally, if not universally, considered that it is the chief purpose of [the First Amendment] to prevent previous restraints upon publication." *Near v. Minnesota ex rel. Olson,* 283 U.S. 697, 713 (1931).  Thus, "[a]ny prior restraint on expression comes ... with a heavy presumption against its constitutional validity." *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 419 (1971) (internal quotation omitted).

Prior restraints are a "most extraordinary remedy" that is warranted "only where the evil that would result from the reportage is both great and certain and cannot be mitigated by less intrusive measures." *CBS, Inc. v. Davis*, 510 U.S. 1315, 1317 (1994) (quoting *Nebraska Press*, 427 U.S. at 562). Though the government "may deny access to information and punish its theft, government *may not prohibit or punish* the publication of that information once it falls into the hands of the press, unless the need for secrecy is manifestly overwhelming." *Landmark Comm'ns,* 435 U.S. at 849 (Stewart, J., concurring) (emphasis added).

In *Near v. Minnesota*, the Supreme Court recognized that prior restraints may be appropriate in very limited cases, such as in reports of troop movements in wartime or incitement to overthrow the government. 283 U.S. at 716. The Court has repeatedly found prior restraints unjustified, however, even in the face of weighty countervailing interests. *See, e.g.*, *Nebraska Press*, 427 U.S. at 568-70 (prior restraint on publication of criminal defendant's confession unjustified, even in light of risk to Sixth Amendment rights); *N.Y. Times v. United States*, 403 U.S. 713 (1971) (prior restraint on publication of "Pentagon Papers" unjustified, despite national security concerns).

Defendants have raised two grounds for the takedown order they seek. First, they claim the video "reveals camera locations and the layout of the housing unit." (DE 1088 at 3). The location of the video cameras are not hidden at the CJC. They are in plain sight. The prisoners can see where there are cameras. Likewise, the layout of the housing units is well-known by and completely evident to the prisoners housed there. Defendants interposed this same security-based objection at the February 22, 2019 hearing in this case to the showing of the video of a December 14, 2018 incident involving an officer using force on a seriously mentally ill prisoner

that Jail personnel later concluded was excessive.  The Court denied the objection then, and

Defendants' objection here is just as lacking in merit.

Second, Defendants claim they are "concerned with the possible repercussions for the

staff involved in the use of force incident" if the video remains on the ACLU's website.  (DE

1088 at 3).  The July 2, 2018 video was shown in open court without objection over three months

ago.  Defendants have presented no concrete evidence of any "repercussions' officer Crooke has

suffered because the video was shown in open court.  They have presented no concrete evidence

of harm that has come to officer Crooke directly as a result of the video being republished on the

ACLU's website.  In fact, officer Crooke suffered no "repercussions" at all from this incident

because Defendants failed to abide by their own policies and initiate formal disciplinary

proceedings against him, as Defendants themselves acknowledged at last month's hearing.

Regardless, Defendants' speculative and unsupported claim that keeping the video on the

ACLU's website somehow endangers officer Crooke falls far short of the type of concrete,

overwhelming showing the Government must make to justify the "extraordinary remedy" of a

prior restraint.  *See Davis*, 510 U.S. at 1318 (refusing to rely on "speculative predictions as based

on 'factors unknown and unknowable'") (quoting *Nebraska Press*, 427 U.S. at 563).

## IV.     Defendants Have Failed to Meet Their Heavy Burden to Deny the Public Access to Critical Video Evidence in This Case.

Public access to trials "protect[s] the free discussion of governmental affairs" that is

essential to the ability of "the individual citizen ... [to] effectively participate in and contribute to

our republican system of self-government."  *Globe Newspaper Co. v. Superior Court*, 457 U.S.

596, 604, (1982) (internal quotation marks omitted).  The Supreme Court has observed:

> A trial is a public event. What transpires in the court room is public property.  If a
> transcript of the court proceedings had been published, we suppose none would
> claim that the judge could punish the publisher for contempt. … Those who see

and hear what transpired can report it with impunity.  There is no special prerequisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it.

*Craig v. Harney*, 331 U.S. 367, 374 (1947).

The press "does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism." *Nebraska,* 427 U.S. at 560 (internal quotations omitted).

As a consequence, the First Amendment embraces a right to civil trials.  *Publicker Industries, Inc. v. Cohen,* 733 F.2d 1059, 1070 (3d Cir. 1984); *see also Nixon v. Warner Comm'ns, Inc.,* 435 U.S. 589, 597 (1978) ("It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents.").

There is also a strong common law presumption for the public's right to inspect and copy judicial records that "antedates the Constitution." *Bank of America Nat'l Trust and savings Ass'n v. Hotel Rittenhouse Assoc's,* 800 F.2d 339, 343 (3d Cir. 1986).  "The public's right of access extends beyond simply the ability to attend open court proceedings.  Rather it envisions a pervasive common law right to inspect and copy public records and documents, including judicial records and documents." *In re Cedant Corp.*, 260 F.3d 183, 192 (3d Cir. 2001) (internal quotations omitted).  The common law presumption of public access is rooted in many of the same principles that form the basis of the public's First Amendment right to court access, including the public's right to keep a watchful eye on the operations of public agencies, and to ensure the public has confidence in the effective administration of justice.  *United States v. Criden*, 648 F.2d 814, 820-21 (3d Cir. 1981).

In *Criden*, the Third Circuit considered the common law right of access to video tapes admitted into evidence during the well-publicized Abscam prosecutions. The district court denied the intervening broadcasters' application to copy and distribute the tapes on the grounds that the rebroadcast would taint the jury pool in the event of retrial and unduly punish innocent third parties. *Id.* at 816. On appeal, the Third Circuit held that there is a strong presumption that material introduced into evidence at trial should be reasonably accessible in a manner suitable for copying and broader dissemination. *Id.* at 823. This strong presumption was based on two factors: first, the common law right of access to judicial records identified in *Nixon*, and second, the significant interest of the public in observation, participation, and comment on the trial events. *Id.* Because the district court gave insignificant weight to these two factors, the Third Circuit remanded with instructions to grant the broadcasters' application, "except for that material which the district court explicitly determines to be impermissibly injurious to third parties." *Criden I*, 648 F.2d at 829.

On remand, the district court permitted the broadcasters to copy and disseminate the tapes, but with blanket instructions that all portions making reference to individuals or entities not named as defendants in the underlying prosecution were to be excised. The broadcasters again appealed the order, and again they prevailed. The Third Circuit found such broad redactions nullified its previous ruling. *United States v. Criden*, 681 F.2d 919, 921 (3d Cir.1982). The court then undertook the redactions itself. Its sole comment on the substance of the videotapes consisted of the following: "Very few of the references to third parties, albeit unflattering, and we may assume false, rise to the level of intensified pain, as distinguished from mere embarrassment, which would warrant deletion from the tapes themselves . . . ." *Id.* at 922.

In *United States v. Martin*, 746 F.2d 964, 968 (3d Cir. 1984), the Third Circuit held that the common law right of access to judicial records extends to documents not admitted into evidence.   There, the district court had denied media access to transcripts given to jury members of recorded conversations that were played in open court, in part because the transcripts were not admitted.  The Third Circuit reversed.  It held that the strong presumption in favor of the public's access to judicial records was not limited to admitted evidence, but rather includes "transcripts, evidence, pleadings, and other materials submitted by litigants."   *Id.* at 968 (internal quotations omitted); *see United States v. Smith*, 787 F.2d 111, 114-15 (3d Cir.1986) (holding the right of access extends to a transcript of a sidebar conference in which the district court ruled inadmissible a question posed by the government's lawyer, reasoning that while exclusion of the press and others from such conferences may be justified, the public interest in the ruling is not diminished.)

Under controlling Third Circuit precedent, the security videos that will be shown or submitted to the Court are judicial records to which the public has a presumptive right to review. Defendants seek an Order that would bar the press and public from viewing any more videos presented as evidence in this case.  The Court must analyze the issue under the heightened standards for the First Amendment and common law presumptions of access to court records and not under the "good cause" standard under the Fed. R. Civ. P. 26(c)(1), as Defendants argue.

In order to override the right of public access, the party seeking the closure of a hearing or the sealing of part of the judicial record "bears the burden of showing that the material is the kind of information that courts will protect" and that "disclosure will work a clearly defined and serious injury to the party seeking closure."  *In re Cedant,* 260 F.3d at 194 (internal citations omitted).  In delineating the injury to be prevented, specificity is essential.  *See Publicker,* 733

F.2d at 1071. "Broad allegations of harm, bereft of specific examples or articulated reasoning, are insufficient." *In re Cedant,* 260 F.3d at 194. "The strong common law presumption of access must be balanced against the factors militating against access. The burden is on the party who seeks to overcome the presumption of access to show that the interest in secrecy outweighs the presumption." *Id.* (internal quotations and citation omitted).

Defendants have failed to meet their heavy burden to overcome the strong presumption in favor of public access to the videos made part of the judicial record in this case. Their objection based on a security concern that allowing public access to the videos will reveal the location of the cameras and layout of the housing units is fatuous, since this information is already readily available to the prisoners housed there. This objection was already rejected by the Court at last month's hearing. Their claim that allowing public access to future videos shown in court will cause "repercussions for the staff involved," (DE 1088 at 3) is exactly the type of "[b]road allegation[] of harm, bereft of specific examples or articulated reasoning," that the Third Circuit has held is insufficient. *See In re Cedant,* 260 F.3d at 194.

Defendants' unsupported concerns are not sufficient to preclude public access to these vital videos. As the Third Circuit has held, "the public has a substantial interest in the integrity or lack of integrity of those who serve them . . . ." *United States v. Smith*, 776 F.2d 1104, 1114 (3d Cir. 1985). The public's interest in the conditions at the CJC, and the conduct of government officials in their treatment of prisoners, is of the highest public interest.

The videos that have been presented as evidence in this case have covered life-threatening incidents at the Jail. These include instances of officers beating restrained prisoners;[2]

---

[2] *See* Nov. 14, 2011 hearing tr. at 22:1-32:8 (Schwartz), appended as Ex. C.

a prisoner setting fire to fellow prisoner's cell after an officer had abandoned his security post;[3] and a prisoner walking out of his unit, past unsecured security doors, and stabbing a fellow prisoner.[4]   These hearings at which the associated videos were played received heavy coverage in the local press.  *See, e.g., "Accused Murderer Stabbed Fellow Inmate After Walking Through Unlocked Doors," Virgin Islands Daily News*, Feb. 26, 2018**.**  In fact, the video of the prisoner setting fire to a fellow prisoner's cell while unsupervised has been available on the *Daily News'* website for close to three years. *See "Jail Fire," Virgin Islands Daily News,* posted May 31, 2016, *available at* http://www.virginislandsdailynews.com/news/local/jail-fire/video_ff70c609-cec3-5e40-b94d-30fb60a63fa6.html.  In these circumstances, denying the public access to these videos presented as evidence of government officials' misconduct is particularly unwarranted. As the Third Circuit held in *Criden:*

> When the defendants themselves were public figures and their conduct was already the subject of national publicity and comment, we find the district court's concerns about the incremental effect of rebroadcast publicity to be unconvincing. The glare of publicity that may follow rebroadcast of the activities of these defendants cannot be compared with that which might lead a court to shield children, victims of sex crimes, some informants, and even the very timid witness or party.

*Criden*, 648 F.2d at 825 (internal quotations omitted).

The unsubstantiated and vague allegations of harm Defendants assert pale in comparison to the compelling presumption of public access at issue here.  The security videos are not the product of standard pretrial discovery, but rather are provided as required by the Settlement Agreement Defendants voluntarily entered into with Plaintiffs.  *See, e.g.,* DE 765-1 IV.C.1.m. (requiring implementation of polices for the "operation and placement of security cameras"); H.1.i. (requiring videotaping of al planned use of force incidents; and "retention of all videos of

---

[3] *See* May 27, 2016 hearing tr. at 90:20-93:5 (Bogard), appended as Ex. D.
[4] *See* Feb. 23, 2018 hearing tr. at 87:6-99:06 (Williams), appended as Ex. E.

use of force incidents for review by Plaintiffs' counsel upon request."); VII. (requiring

Defendants to maintain sufficient records and documents to demonstrate compliance with all

requirements of the Agreement, and "make such records available to Plaintiffs' Counsel at all

reasonable times for inspection and copying.").   These videos show potential constitutional

violations at the CJC, as well as violations of the Settlement, and the public and press have a

constitutionally protected interest in obtaining and reviewing this information.   Given that the

security videos concern government officials carrying out their public duties in an area of great

public concern—ensuring the safety and security of prisoners held in St. Thomas' lone

correctional facility—the presumption in favor of the public's access to these videos is at its

strongest.

**V.      Defendants Fail to Meet Their Burden to Demonstrate Good Cause.**

Even as to those videos not submitted as part of the record here, Defendants' motion must

fail.  A party wishing to obtain an order of protection over discovery material must demonstrate

that good cause exists for the order.  Fed. R. Civ. P. 26(c).  Good cause requires a showing that

"disclosure will work a clearly defined and serious injury to the party seeking closure.  The

injury must be shown with specificity." *E.E.O.C. v. Kronis, Inc.,* 620 F.3d 287, 302 (3d Cir.

2010) (internal quotations omitted).  "Broad allegations of harm, unsubstantiated by specific

examples or articulated reasoning, do not satisfy . . . Rule 26(c)." *Cipollone v. Liggett Group,*

*Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986).  Here, Defendants have only made claims the Court

has already addressed and discarded, or claims so amorphous as to be meaningless. *See* DE 1088

at 3 ("[T]he emotional and social impact of the video is substantial, as it connects sight and

sound with a viewer's emotions, which may include rage and sympathy . . . .   It goes without

saying that St. Thomas is a small island and tight knit community.  There are few degrees of separation.").

Videos of incidents at the jail have been shown repeatedly in open court during the course of this case, covering multiple areas of the Jail, all without Defendants objecting on security grounds.  *See, e.g.,* Ex. C (Sept. 29, 2010 hearing tr. at 22:1-32:8 (Schwartz) (video of beating of prisoners on rooftop recreation area)); Ex. D (May 27, 2016 hearing tr. at 90:20-93:5 (Bogard) (video of prisoner setting fire to fellow prisoner's cell in Cluster 6)); Ex. E (Feb. 23, 2018 hearing tr. at 87:6-99:6 (Williams) (video of prisoner going through two unlocked security doors in cluster 3 and hallway to stab a known enemy in the visitation area)).

Furthermore, the Settlement Agreement obligates Defendants to conduct security rounds to discover misconduct or other security issues at the CJC, irrespective of the placement or operation of the cameras or layout of the units.  *See* DE 765-1, IV.B.1.d. (requiring supervision of prisoners by corrections officers assigned to cellblocks, "including conducting of adequate rounds by corrections officers and security supervisors in all cellblocks and in areas of the prison other than cellblocks.").  Given this, Defendants' security concerns ring hollow, and fall far short of satisfying the "good cause" standard of Fed. R. Civ. P. 26(c)(1).

Even were the Court to credit Defendants' purported showing of harm, the broad protective order Defendants seek fails the balancing test outlined by the Third Circuit in *Pansy v. Borough of Stroudsburg,* 23 F.3d 772 (3d Cir. 1994).  In *Pansy*, a newspaper sought access under a state public record law to a settlement agreement entered into between a Pennsylvania borough and its former police chief in a civil rights action.  *Id.* at 776.  The settlement agreement was not filed with the court but was subject to a confidentiality order, so the borough refused to disclose it.  *Id.*  The district court denied the newspaper's motion to intervene as well as its motion to

14

vacate or modify the confidentiality order.  *Id.* at 776-77.  The Third Circuit reversed, holding

that "'good cause' must be demonstrated to justify the [protective] order."  *Id.* at 786.  The Court

recognized that the public interest in access to the settlement agreement was "particularly

legitimate" given that at least one of the parties was a public entity, explaining that whether

"disclosure will be limited depends on a judicial balancing of the harm to the party seeking

protection (or third persons) and the importance of disclosure to the public."  *Id.* at 786-87

(citations omitted).

In *Pansy*, the Third Circuit recognized several relevant factors in the "good cause"

analysis that, when present—as they are here—all favor disclosure:  (1) whether "confidentiality

is being sought over information important to public health and safety," (2) "whether a party

benefiting from the order of confidentiality is a public entity or official," and (3) "whether the

case involves issues important to the public."  *Id.* at 787-88.

All three factors weigh against issuing a protective order in this case.  First, the protective

order is sought by a public entity—the government of the Virgin Islands.  Second, Defendants

seek keep secret information that goes to the core of public health and safety—the treatment of

prisoners by public officials and continued rights violations of those prisoners.  Third, this case

unquestionably involves issues important to the public.  The public has a strong interest in

making sure the government does not engage in constitutional or other rights violations, and the

administration of public agencies such as the BOC is of overarching public concern.

### Conclusion

For the foregoing reasons, Defendants' Motion for a Protective Order (DE 1088) should

be denied.

Respectfully submitted,

/s/ **ERIC BALABAN**
Eric Balaban
National Prison Project of the ACLU Foundation
915 15th Street
Seventh Floor
Washington, D.C. 20005
(202) 393-4930

*Attorneys for Plaintiffs*

Dated: March 8, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on March 8, 2019, a true and correct copy of the foregoing pleading and appended exhibits were served by the Notice of Electronic Filing administered by this Court to the following counsel for Defendants at the following address:

Carol Thomas-Jacobs
Assistant Attorney General
V.I. Department of Justice
Office of the Attorney General
8050 Kronprindens Gade
St. Thomas, VI 00902
carol.jacobs@doj.vi.gov

Shari D'Andrade
Special Assistant Attorney General
V.I. Department of Justice
Office of the Attorney General
6040 Estate Castle Coakley
Christiansted, VI 00820
shari.d'andrade@doj.vi.gov

/s/ **ERIC BALABAN**
Eric Balaban