## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

_____
                                                    :
LAWRENCE CARTY, et al.,            :            Civil No. 94-78
                                                    :
Plaintiffs,                                    :
                                                    :
v.                                               :
                                                    :
ALBERT BRYAN, et al.,                :
                                                    :
Defendants.                               :
_____:

### PLAINTIFFS' BRIEF REGARDING THE APPONTMENT OF A RECEIVER

It has been twenty-five years since the Court approved the first Settlement Agreement in this case, mandating specific improvements in virtually every aspect of operations and conditions at the Criminal Justice Complex (CJC) and CJC Annex. *See Carty v. Farrelly*, No. 3:94-cv-78, slip. op. at 1 (D.V.I. Dec. 7, 1994). Since then, Defendants have engaged in a pattern of noncompliance, resistance, and disregard for the Agreement and the remedial orders of the Court. Governors and Bureau of Corrections (BOC) directors have come and gone, each pledging to meet their legal obligation to provide Plaintiffs with adequate care and treatment. Their words have rung hollow as deadlines have passed and promises have been broken. As a result, dangerous conditions at the jail persist, threatening the lives and safety of prisoners and staff alike. Four times Defendants have been held in contempt, none of which have prompted greater compliance.

In 2013, the parties once again agreed on a comprehensive consent decree that was approved and entered as a court order. (DE 780) (the "Decree"). In the ensuing eighteen months, Defendants did almost nothing to comply with the Decree. Their efforts were so feeble that the Court was compelled to put the case on a schedule of quarterly evidentiary hearings, and require Defendants to implement quarterly goals to inch them towards compliance. (DE 833).

1

Since then, the Court has heard overwhelming evidence of Defendants' ongoing non-compliance.  Prisoners have suffered due to Defendants' neglect.  One seriously mentally ill women hanged herself at the jail after repeatedly going on hunger strikes, a preventable death had Defendants abided by the decree and hospitalized her. DE 832-1 (Second Report of Kathryn Burns, M.D.) at 40-42.  Another seriously mentally ill woman who was pregnant was placed in a solitary confinement cell roughly the size of a parking space while she refused medications and treatment, including prenatal care.  DE 908-1 (Dr. Burns' Third Report) at 2.  She eventually gave birth on the floor of her lockdown cell.  *Id.*  A seriously mentally ill man who was declared not guilty by reason of insanity (NGRI) remained on indefinite lockdown at the CJC for years without any treatment. DE 975-1 (Dr. Burns' Fourth Report) at 30**.**  He was held without an apparent legal basis to do so.  The jail now has held another NGRI acquitee for close to year.  DE 1086 at 8.  As of the last hearing, at least 14 seriously mentally ill men and women whom Defendants themselves identified as needing to be hospitalized were still being held at the jail, some for months and years.  *See*, Ex. A, Hr'g Tr. 54:17–69:11, Feb. 22, 2019 (Ruth Warren).

But the litany of abuse goes beyond the dangerously inadequate mental health care at the CJC.  The jail is a violent facility beset by security lapses.  The Court has taken evidence and seen videos of officers assaulting prisoners, and of prisoners assaulting one another.  *See, e.g.*, Ex. B, Hr'g Tr. 22:1-32:8, Nov. 14, 2011 (Schwartz); Ex. C, Hr'g Tr. 87:6-99:6, Feb. 23, 2018 (Williams).  Eight months ago, an officer physically assaulted a prisoner, placing him in a potentially lethal chokehold, after that man complained about finding a roach in his food.  Ex. D, Hr'g Tr. 90:12–95:18, Nov. 28, 2018 (Mullgrav).  Though the Defendants themselves acknowledged the officer used excessive and punitive force, and the officer had lied about the incident, he remains working at the CJC to this day.  *Id.* at 96:23-24.  No action was taken against

him because the Defendants neglected to follow their own court-ordered protocols. Ex. A, Hr'g Tr. 87:8–93:12, Feb. 22, 2019 (Jimmy Warren).  Just three months ago, another officer repeatedly punched a seriously mentally ill prisoner slated for hospitalization while he curled up on the ground trying to avoid the officer's blows.  Ex. A, Hr'g Tr. 100:1–103:9, Feb. 22, 2019 (Jimmy Warren). Two years ago, a detainee in on a murder charge was able to walk out of his unit armed with a knife via an unsecured security door, open another security door that was supposed to be locked, and repeatedly stab another prisoner who was his known enemy. DE 991 at 8-9.  Another prisoner who was supposed to be on lockdown due to multiple violent incidents was able to set fire to the cell of another prisoner after the officer on duty in the unit abandoned his post.  Ex. E, Hr'g Tr. 90:20–93:5, May 27, 2016 (Bogard).  A seriously mentally ill prisoner was able to also set fire to his own cell while he, too, was on lockdown.  Ex. D, Hr'g Tr. 89:11–19, Nov. 28, 2018 (Mullgrav). This same man was also able to slip past officers with a shank, and threaten a nurse with it.  Ex. F, Hr'g Tr. 84:22–85:24, May 26, 2017 (Williams).  He later assaulted another prisoner with a broken broom handle.  Ex. D, Hr'g Tr. 89:11-19, Nov. 28, 2018 (Mullgrav).  Weapons, drugs, and cellphones continue to find their way into the jail, without timely and thorough investigations as to how this dangerous contraband ended up in the hands of prisoners at the CJC.  *See, e.g.*, DE 1023 at 20; DE 1052 at 18-19.

Two years ago, the jail fell into chaos after Hurricane Irma due to Defendants' failure to comply with the decree's requirement that they develop an emergency evacuation plan.  DE 991 at 1-8.  The generator, which the court's own security expert had repeatedly warned was unreliable, failed.  *Id.*  The jail plunged into darkness.  *Id.*  Prisoners began setting fires after several days.  *Id.* There was no plan in place to evacuate them or secure the building.  *Id.*  Officers called the National Guard to restore order.  *Id.*  Prisoners were transported to the airport to be airlifted to St. Croix,

only to be turned back because there was no plane to transport them. *Id.* Despite this cavalcade of errors, the jail remains vulnerable in the event of another hurricane—the facility is currently connected to the generator for the territorial court, which has failed repeatedly in the past year. DE 1086 at 28.

These incidents are the product of a culture of mismanagement that has plagued the Virgin Islands government for decades. The basic infrastructure of a jail system is absent:  the jail is dangerously understaffed, posts go unmanned, policies are disregarded or are non-existent, security breaches are not investigated, and misconduct goes unpunished.  The quarterly hearings should serve as a public reckoning to sober Defendants up to meet their court-ordered responsibilities.  Instead, they have become a broken record of commitments not met, of promises not kept, and of the needless suffering that the men and women at the CJC have had to endure as a result.

The CJC was never intended to house prisoners long-term.  Its very design makes it almost impossible for current staff to supervise the men and women housed there.  DE 788-1 at 151-52. The building itself is deteriorating, costly to maintain, and "present[s] a danger to staff and inmates."  Ex. **G,** Statement of Winnie Testamark, Director-Designee V.I. Bureau of Corrections, Committee on Homeland Security, Justice, and Public Safety, 33rd Legislature of the Virgin Islands, Mar. 27, 2019, at 1.  Staffing at the facility is dangerously low—there are now 29 officers working at the jail, fewer than half the court-ordered number required to safely manage the facility. Ex. A, Hr'g Tr. 109:22–114:5, Feb. 22, 2019 (David).  The solution to this fundamental problem is evident:  The Government has acknowledged that it needs a new direct supervision jail.  Ex. A at 82:8–84:5 (Testamark).  This project will take years to complete, and require planning and a shared commitment across government agencies.  Yet, precious little has been done.  There is no

site selected for a new jail.  DE 1052 at 15.  Construction plans have not been completed.  *Id.*
Funding for a new jail has not been formally requested from the legislature as part of the BOC's
proposed budgets.  Ex. D, Hr'g Tr. 76:3-8, Nov. 28, 2018 (Mullgrav).

As of now, the territory spends $12-15 million per year to house prisoners in privately-run
off-island facilities.  Ex. G (Testimony of Testamark, W) at 4.  Bureau of Corrections (BOC)
Director-Designee Winnie Testamark acknowledged in her recent testimony before the 33rd
Legislature of the Virgin Islands that building a new jail would pay for itself after a few years.  *Id.*
at 1 ("Ultimately, we will need to build new facilities on St. Thomas and St. Croix.  This will save
money in the long term.")  However, Defendants have failed to take even the initial steps to open
a new facility.  Rather, they have repeatedly opposed setting even the modest goal in this litigation
of developing a strategic plan to open a new jail.  *See* Carty Proposed Goals, filed herewith as Ex.
H.  Without action by the Court, it is clear a new jail will never be built.

The same is true of opening psychiatric beds in the territory.  Defendants' plan to ship
seriously mentally ill men and women to a privately-run facility in South Carolina has been an
abject failure.  Not a single one of the 14 men and women Defendants themselves have slated for
hospitalization has been hospitalized.  DE 1081-1 at 5.  This was predictable, since Defendants
plan was premised on the quick resolution of these patients' criminal cases.  This does not happen
in the territory:  one unfortunate man has remained jailed pretrial for over eight years without
resolution of his criminal case.  DE 1086 at 7.  Again, the answer to this intractable problem is
clear:  the Government must open new psychiatric beds in the territory.  DE 1081-1 at 6.  As BOC
Director-Designee Testamark testified:

> Of the 43 inmates being held in pre-trial detention at the St. Thomas jail, 18 are
> suffering from some form of mental illness.  Some of these inmates have not been
> charged with any crime or were arrested on minor misdemeanors.  But they are
> being kept at the St. Thomas jail simply because the Territory does not have a long-

term, psychiatric facility for chronically mental health patients that could house them.

Providing adequate treatment and facilities for the chronically mentally ill is a Territory wide problem, which manifests itself in Bureau facilities. Virgin Islands residents suffering from acute mental illness are brought to Bureau facilities by default because there is nowhere else to put them. That means that an inmate with mental illness, who may not have committed any crime, may spend months or even years at the St. Thomas jail pending appropriate treatment. One inmate, LC, who suffers from chronic schizophrenia, has been incarcerated for over 8 years while awaiting trial

There is a real risk that these mentally ill inmates will deteriorate while awaiting hospitalization or treatment. To meet the Bureau's obligations under the federal consent decree to hospitalize and treat inmates with mental illness, the Legislature must address the chronic lack of hospital beds in the Territory for those suffering from an acute mental illness.

Ex. G at 2-3.

Yet, again, little has been done to reach this goal. The Virgin Islands Department of Health has refused to accept BOC prisoners into the Eldra Schulterbrant facility, the territory's lone long-term psychiatric facility. DE 1052 at 9-10. The Department has claimed that unnamed "zoning restrictions" prevent that facility from accepting BOC prisoners, without identifying these "zoning restrictions," or explaining what the Department has done to seek variances to them, if they even exist at all. *Id.* at 10. The Department has claimed it has plans to build a new facility at the Anna's Hope site in St. Croix. This is the very same plan the Attorney General testified would be completed by the end of 2004, some 15 years ago. *Carty v. DeJongh*, No. CIV. 94-78, 2007 WL 817607, at *31 (D.V.I. Feb. 27, 2007) (holding Defendants in contempt for, *inter alia,* failing to construct an in-territory forensic unit pursuant to previous remedial order). Here, too, Defendants have repeatedly opposed as a quarterly goal in this case even devising a plan to open new territorial psychiatric beds. *See* Proposed Goals, filed herewith as Ex. I. Without the Court's intervention, territorial hospital beds for Plaintiffs will never be opened.

At the last hearing, the Court inquired of the Government where Defendants were in terms of reaching compliance.  The colloquy is as follows:

THE COURT:  Now, what's your sense of what the outside period of time ought to be for the Government to have a constitutionally operating facility?

MS. D'ANDRADE:  Your Honor, at this time it is hard to give an estimate time frame because—

THE COURT:  I didn't ask for a time.  I said what do you think is the outside limit on that—whatever time it is, what's the outside limit?  Ten years, twenty years, thirty years?  How long should it take on the outside?

MS. D'ANDRADE:  Your Honor, I can't say. It depends upon the circumstances.  I know that the Government has plans for the annex and are waiting for FEMA to determine what the level of damages are and how the Government would be compensated.  When that happens and there are plans to rebuild the annex, the Government would be in a far better condition to come into compliance with the Settlement Agreement.

THE COURT:  Again, my question was what's the outside?  So should I take from that that it can be any number - 20, 30 years?

MS. D'ANDRADE:  No, Your Honor.

THE COURT:  Because this case was filed in what '94, correct?

MS. D'ANDRADE:  Yes.

THE COURT:  That would be almost 25 years now.

MS. D'ANDRADE:  Yes.

THE COURT:  All right.  And the settlement wasn't reached until 2013?

MS. D'ANDRADE:  Yes.

THE COURT:  Six years ago.  But leading up to that, and as I recall my colleague, Judge Brotman, had worked diligently on this from its exception or pretty close to its inception up until the settlement agreement period trying to have the BOC be a constitutionally operating entity.  Would you agree with that?

MS. D'ANDRADE:  Yes.

THE COURT:  So how should I view 25 years?  Is that close to the outer limit or is that in the middle or where would you say that is?

MS. D'ANDRADE:  I would say it's closer to the middle because if you look within the time --

THE COURT:  Let me unpack that for a moment.  If you say close to the middle, that would mean a 50-year period on this then.  Would that be correct? You said close to the middle, right?
MS. D'ANDRADE:  Yes.
THE COURT:  So would that mean 50 years then?
MS. D'ANDRADE:  Not exactly 50 years, but approaching 50 years, again, depending on the circumstances.

Ex. A, Feb. 22, 2019 hr'g tr. at 118-120.

This is chilling.  After a quarter century the Defendants admit that it may take another 25 years for them to reach compliance in this case and run a constitutionally adequate system.  The Court has taken almost every possible step short of appointing a receiver to prod Defendants to compliance.  It has approved and entered two comprehensive consent decrees.  It has entered general remedial orders and specific remedial plans, appointed a special master to oversee monitoring, ordered the Defendants to hire technical experts, held the Defendants in contempt four times, created a remedial fund to remove all financial barriers to compliance, and placed this case on a schedule of quarterly compliance hearings.  These efforts have had little or no effect on improving conditions at the CJC.  Now, Defendants suggest that they should be indulged for another 25 years before they are expected to comply.

In the face of Defendants' obduracy, the Court has ordered the parties to brief whether it should consider appointing a receiver.  It has also asked the parties to brief whether it should hold a show-cause hearing as to the appointment of a receiver.  Plaintiffs address herein the questions posed by the Court.

## I.      THE COURT HAS THE DUTY TO ENFORCE ITS DECREE AND THE POWER TO APPOINT A RECEIVER.

The broad power of federal courts to grant equitable relief for constitutional violations has long been established. *See Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."); *Bell v. Hood*, 327 U.S. 678, 684 ("[W]here federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief."); *Inmates of Allegheny County Jail v. Pierce*, 487 F. Supp. 638, 643 (E.D. Pa. 1980) ( "The Court has broad, equitable powers to make whatever order is required in this case to remedy the constitutional violations found.").

The Supreme Court has recognized that "constitutional violations in conditions of confinement are rarely susceptible to simple or straightforward solutions." *Brown v. Plata,* 563 U.S. 493, 525 (2011).  Along with the power to remedy ongoing violations, federal courts have a duty to ensure that existing remedies are sufficient to ensure compliance with the Constitution:

> A court that invokes equity's power to remedy a constitutional violation by an injunction mandating systemic changes to an institution has the continuing duty and responsibility to assess the efficacy and consequences of its order.  Experience may teach the necessity for modification or amendment of an earlier decree.

*Id.* at 542.

The Court's equitable power includes the power to appoint a receiver. Courts have used receivers "to coerce public officials to comply with legal mandates in a number of factual settings, including public schools, housing, highways, nursing homes, and prisons." *Dixon v. Barry*, 967 F. Supp. 535, 550 (D. D.C. 1997); *see also Shaw v. Allen*, 771 F. Supp. 760, 762 (S.D.W.Va.1990) ("Where more traditional remedies, such as contempt proceedings or injunctions, are inadequate under the circumstances a court acting with its equitable powers is justified, particularly in aid of an outstanding injunction, in implementing less common remedies, such as a receivership, so as to

achieve compliance with a constitutional mandate."); *Gary W. v. Louisiana,* 1990 WL 17537, *17, *28-33 (E.D. La. Feb.26, 1990) (appointing a receiver to oversee state children's services agencies where the court's mandates were continually met with "a dismal record of non-compliance and management by crisis"); *Newman v. Alabama,* 466 F. Supp. 628, 635 (M.D.Ala.1979) ("The extraordinary circumstances of this case dictate that the only alternative to non-compliance with the Court's orders is the appointment of a receiver for the Alabama prisons.").

Receivers have been appointed in prison conditions cases where, as here, there is a long record of non-compliance with court-ordered remedies. In *Newman v. Alabama*, the district court determined that the "extraordinary circumstances" of the case dictated the need for a receivership over Alabama's state prison system. *Id.*   In appointing a receiver the court detailed the prison system's failure to achieve compliance, noting that while the Board of Corrections has made some progress, "what was true in 1972 and 1976 is still true [in 1979]." *Id.* at 630.  Specifically, the court noted that the State had failed to create a plan to address its overcrowding problem; failed to improve its prisoner classification errors; failed to provide adequate treatment to mentally ill prisoners; neglected to improve living conditions posing imminent danger to the health of inmates; failed to employ sufficient personnel; and continued to provide inadequate medical care.  *Id.* at 630-34.

Based on a lack of compliance with the court's orders for nearly seven years and no serious attempt by the Board of Corrections to articulate a plan, the court concluded "there is no reasonable likelihood of effective cooperation and substantial compliance from the present Board of Corrections." *Id.* at 630.  In deciding to appoint a receiver, the court reasoned "[f]urther injunctions or contempt proceedings will not accomplish the task of compliance" and instead "promise only confrontation and delay."  *Id.* at 635.

In *Shaw v. Allen*, 771 F. Supp. 760 (S.D.W. Va. 1990), a district court appointed a receiver to bring a county jail into compliance. The court noted that a receivership "is an intrusive remedy which should only be resorted to in extreme cases." *Id*. at 762. However, the court determined that the current scenario presented an "extreme case" as the state remained in non-compliance for nearly eight years after the entry of the court's original order, despite four subsequent contempt proceedings. *Id*. at 763.

In response to contempt petitions filed by the prisoner class, the court had taken several different approaches to prodding compliance including monitoring and inspections and an order requiring the prisoner population be reduced. *Id*. at 761. The year prior to imposing a receivership, the court had appointed a monitor to issue reports. *Id*. Despite these efforts, the court found that "prevailing conditions of noncompliance . . . resulted in a situation of emergency creating health and sanitation hazards to inmates." *Id*. at 762.

The *Shaw* court determined that "[a]n allowance of additional time . . . would only likely result in additional injunctions or contempt proceedings and would offer little hope of anything other than future confrontations and delays." *Id.* at 763. The court reasoned that although the remedy was drastic, it remained less intrusive than the plaintiffs' recommendation of closing down the jail entirely. *Id*. at 763-64.

### A.    The *Plata* Decision

At the last hearing, the Court noted specifically the District Court's 2005 appointment of a receiver in *Plata v. Schwarzenegger*, No. 01 Civ. 1351, 2005 WL 2932253 (N.D. Cal. Oct. 3, 2005). *See* Ex A, Feb. 22, 2019 hearing tr. at 131:1-3, 24-132:1 (Gomez, J.)

California prisoners filed *Plata* in April 2001 alleging the State was providing constitutionally inadequate health care at all California state prisons. In June 2002, the State

agreed to enter into a Stipulation for Injunctive Relief to implement new medical care policies and procedures at all institutions. *Plata*, 2005 WL 2932253 at *1.  As part of the Stipulation, the State was ordered to implement new policies and procedures on a staggered basis, with seven prisons to complete implementation in 2003 and five additional prisons to complete implementation for each succeeding year until state-wide compliance was achieved.  *Id*. at *2.

In July 2004, an expert report found "an emerging pattern of inadequate and seriously deficient physician quality in CDC facilities" put prisoners at a serious risk of harm or death.  *Id*., at *2-3.  In response, the State agreed to a Stipulated Order requiring additional short-term remedies to bring it into compliance with the Stipulation. *Id*. at *2.  The order also required the State to develop proposals regarding physician and nursing classifications and supervision and fund "Quality Management Assistance Teams" and other support positions.  *Id*.

In May 2005, the court issued an order to show case as to why a receiver should not be appointed to manage health care delivery for the CDCR.  *Id*.  Following an evidentiary hearing, the court found that a receiver was necessary.  *Id*.  The court noted that while the 2002 Stipulation gave the first seven institutions under the staggered implementation plan a calendar year to implement the requisite policies and procedures, no prison had yet implemented them.  *Id* at *19. The State admitted in its response to the 2005 order that it had not complied with the 2002 stipulation and that it did not foresee a possibility of doing so "unless something dramatically changes."  *Id*.

The court also found that despite extensions of time from the court, the State "failed to come close to meeting the terms" of the 2004 Stipulation.  *Id*.  The court found that CDCR lacked medical leadership or sufficient medical staff, had inadequate treatment procedures and policies, failed to provide timely care, and had been unable to overcome obstacles towards compliance,

including collective bargaining and budgeting.  *Id.*  at **3-23.  The district court concluded that a receivership was necessary to overhaul "the unconscionable degree of suffering and death" caused by "[d]ecades of neglecting medical care while vastly expanding the size of the prison system." *Id.*  at *23.

### 1.    Ninth Circuit Affirms Imposition of Receiver

In May 2007, the receiver filed a motion, which was joined by the State, to construct 10,000 new beds.  *Plata v. Schwarzenegger*, 603 F.3d 1088, 1092 (9th Cir. 2010).  Over the next fourteen months, the receiver filed numerous motions and plans of actions concerning the construction of new facilities.  *Id*.  Although the State joined all of these motions, in 2008 it opposed a court order directing the State to transfer $250 million to the receiver as part of the court-approved plan.  *Id*. Subsequently, the State filed a motion to end the receivership and replace the receiver with a special master and terminate the Receiver's construction plan.  *Id*. at 1092-93.

On appeal, the State argued, *inter alia*, that the receivership was not the least intrusive means of remedying the constitutional violations.  *Id*. at 1096-97.  The Ninth Circuit rejected this claim, holding "the record simply does not support the State's contention that anything less than a receivership would have remedied the undisputed conditional deficiencies in prisoners' health care at the time the receivership was imposed."  *Id*. at 1097.  The court pointed to the State's own admissions that it could not carry out the two previous orders and recognized that the district court had attempted less drastic remedies over "long periods" before concluding that a receiver was necessary.  *Id*.

The State also contended that regardless of the reason for appointing a receiver in 2005, the current status of health care quality in the CDRC made the receivership no longer the least intrusive means.  *Id*.  The court did not directly respond to the allegation, instead explaining that

the issue raised required a fact-intensive inquiry by the district court, but did note that "[t]he State to this day has not pointed to any evidence that it could remedy its constitutional violations in the absence of a receivership." *Id*. at 1098.

In affirming the district court's decision to appoint a receiver, the Ninth Circuit noted that the receiver was imposed "only after the State admitted its inability to comply with consent orders intended to remedy the constitutional violations in its prisons." *Id*. at 1097. The court acknowledged the failed remedies previously issued by the district court and held that "the district court justifiably concluded that the State's personnel simply could not or would not bring the State into constitutional compliance in the foreseeable future." *Id*.

## 2.    The Receiver's Role in Creating Compliance

As of February 2019, thirteen years since the receiver was appointed, management of nineteen prisons and two system-wide functions have been delegated back to the State, leaving four remaining prisons under the receiver's authority. *See* Joint Case Management Conference Statement ("Statement") at 1, *Plata v. Newsom*, No. 01 Civ. 13511 (N.D. Cal. Feb. 26, 2019).

Under the receiver, staff medical provider provisions at most prisons are now filled at a rate of 90% or higher. *Id*. at 5. The receiver has also implemented programs targeted at substance abuse treatment and providing treatment to prisoners with Hepatitis C. *Id*. at 7-9. The receiver has also made numerous revisions to medical policies and procedures regarding core medical delivery functions, including scheduling and access to care, reception center care, health care transfers, specialty services, and specialized healthcare housing, which the *Plata* plaintiffs have sought to keep intact. *Id*. at 10.

## B.    Longstanding Non-Compliance Merits the Appointment of a Receiver.

To be sure, the appointment of a receiver is an intrusive remedy.  "[O]ne of the most important considerations governing the exercise of equitable power is a proper respect for the integrity and function of local government institutions." *Missouri v. Jenkins*, 495 U.S. 33, 51 (1990).  However, "where federal constitutional rights have been traduced, principles of restraint, including comity, separation of powers and pragmatic caution dissolve." *Stone v. City and County of San Francisco*, 968 F.2d 850, 861 (9th Cir. 1992) (quoting *Duran v. Carruthers*, 678 F. Supp. 839, 847 (D.N.M. 1988);  *see also Shaw*, 771 F. Supp. at 763 (in appointing a receiver to run the county jail, the court wrote, "where the actions or omissions of elected public officials . . . impermissibly infringe on the constitutionally protected rights of individuals, including prisoners, federal courts as interpreters and, most importantly, protectors of the United States Constitution must act to stop such infringement.").

The district court in *Dixon* noted that "where the local authority's failure to comply with court orders provides no factual basis for respecting the local authority, the court need not withhold use of its equitable powers based on the theoretical principles of federalism and comity." *Dixon*, 967 F. Supp. at 552.  The *Dixon* court held that federalism concerns did not bar the appointment of a receiver to ensure that mentally ill residents of the District of Columbia had access to treatment and services mandated by local and federal laws.  It explained "the repeated failure of the District to comply with the Court's orders eliminated any basis for judicial restraint when remedying noncompliance." *Id.* at 551.

Similarly, in *Plata*, Judge Henderson recognized that the separation of powers and comity concerns inherent in the appointment of a receiver to administer health services for the California prison system were unavoidable consequences of the state's noncompliance.  *See Plata,* 2005 WL 2932253 at *31.  The court stated that "it would be fair to say that the Receivership is being

imposed on the Court, rather than on the State, for it is the State's abdication of responsibility that has led to the current crisis." *Id.* The court held that the necessity of a receiver "is a disturbing result, not simply because it is a drastic measure for the Court, but because it exhibits a debilitation of the democratic process whereby the State executive branch has effectively turned over its obligations to the federal judicial branch." *Id.* The court concluded that "[t]his dual problem implicating concerns of separation of powers and comity unfortunately will remain until the State proves itself ready to regain control of the prison medical system." *Id.*

As in *Shaw*, *Newman, Dixon*, and *Plata*, Defendants' intransigence has left the Court with no choice but to take action to enforce the Decree. The appointment of a receiver must be among the remedies the Court now considers. Plaintiffs' lives and safety will continue to be put at risk if this Court were to decline to act now.

## II.   PLAINTIFFS' LIVES AND SAFETY WILL REMAIN ENDANGERED IF THE COURT DOES NOT ENFORCE THE DECREE.

In fashioning a remedy, a court must use the least intrusive power possible to cure constitutional violations. *See Jenkins*, 495 U.S. at 51 (recognizing that before intruding on local authority, district court must assure itself that no lesser alternatives are adequate to the task). But the Court is not restricted to using means that have proved inadequate or show no promise. As the Supreme Court has held, "federal courts are not reduced to issuing injunctions against state officers and hoping for compliance. Once issued, an injunction may be enforced." *Hutto v. Finney*, 437 U.S. 678, 690 (1979). And the Court undoubtedly has "ample authority to go beyond earlier orders and to address each element contributing to the violation." *Id.* at 687. Among the options available to the Court are the appointment of a receiver; entry of more specific remedial orders; and holding Defendants in contempt, and imposing fines, including coercive contempt fines on the Government until it complies. These remedies can be ordered together, or in any combination so as to "grant

the necessary relief." *Bell*, 327 U.S. at 684.  As the Court has only asked the parties to brief the appointment of a receiver, Plaintiffs have not provided extensive argument regarding the necessity of contempt sanctions or additional remedies.  However, the Court should consider each of these possible remedies at the same time it considers appointment of a receiver.  *See* Part II.B., *infra*.

**A.**　　**There is an Overwhelming Record Supporting the Appointment of a Receiver.**

Courts appoint receivers when two essential conditions are met: there is an immediate threat of harm to plaintiffs, and less extreme remedies have been exhausted or proved futile.  *See Plata,* 2005 WL 2932253 at *23; *Dixon*, 967 F. Supp. at 550. Additionally, courts have considered the following related factors: (1) whether continued insistence on compliance with the court's orders would lead only to confrontation and delay; (2) whether there is a lack of leadership to turn the tide within a reasonable period of time; (3) whether there is bad faith; (4) whether resources are being wasted; and (5) whether a receiver is likely to provide a relatively quick and efficient remedy.  *Plata,* 2005 WL 2932253 at *23.

**1.**　　**Defendants' Failure to Comply with the Decree Endangers Plaintiffs.**

In the past twenty years, the Court has held Defendants in contempt four times.  In each contempt order, the Court has noted life-threatening conditions throughout the jail system.  *See, e.g., Carty v. Farrelly*, 957 F. Supp. 727, 739 (D.V.I. 1997) ("[t]he abominable treatment of the mentally ill inmates shows overwhelmingly that defendants subject inmates to dehumanizing conditions punishable under the Eighth Amendment."); *Carty v. Turnbull*, 144 F. Sup. 2d 395, 408 (D.V.I. 2001) ("Defendants continue to house acutely disturbed prisoners in need of hospitalization at the CJC."); *Carty v. Turnbull,* No. 94-78, slip. op. at 44 (D.V.I. May 238, 2003) ("The jail continues to remain dangerously understaffed . . . .  In 2002, the jail was plagued by disturbances and prisoner-on-prisoner assaults . . .where housing unit officers were absent from their posts.");

*Carty v. DeJongh*, 2007 WL 817607 at *20 (D.V.I. Feb. 27, 2007) ("Defendants have made virtually no progress in completing the forensic facility at Anna's Hope, despite assuring the Court they would open the facility no later than November 2004.").

Though the Court reset the remedies in this case via the 2015 Decree, the jail is still plagued by the same life-threatening conditions described in the previous contempt decisions. The jail remains dangerously understaffed. Officers fail to carry out basic security functions. Contraband and weapons remain prevalent. Prisoners are able to launch potentially fatal assaults on one another. Officers employ excessive force on prisoners. Chronically mentally ill men and women continue to languish at the jail. The chaos at the jail is a function of a lack of reliable leadership, policies, staff, training, and accountability. A fundamental change must occur now to end Plaintiffs' incalculable and enduring suffering. The current situation echoes those in other cases where a receiver has been appointed. As the *Plata* court found, "removing defendants from control of the . . . system and imposing a Receiver to radically transform it is the only viable means of saving lives and creating a stable and effective health care delivery system." *Plata*, 2005 WL 2932253 at *24; *see also Dixon*, 967 F. Supp. at 554 ("There is no doubt that without severe action by the Court [in appointing a receiver] . . . suffering and loss of life will continue unabated.").

### 2. The Court's Efforts to Use Less Intrusive Means to Spur Defendants to Comply Have Failed.

The Court has exhausted virtually all methods of prodding Defendants into compliance short of appointing a receiver. It has held Defendants in contempt four times, though it has declined to order coercive contempt sanctions. However, the Court need not order coercive fines before appointing a receiver. As the *Plata* court held:

> [T]he Court does not view a contempt remedy as having a realistic likelihood of proving effective. Pursuing a contempt remedy would greatly extend the future life-span of the current dysfunctional system, thereby placing innumerable lives in

> grave danger, with no hope that the sanctions would produce a positive result due
> to the State's self-professed inability to cope with the magnitude and complexity of
> the crisis. Even if this lack of will were overcome . . ., the Court believes that other
> impediments–not the least of which are . . . bureaucratic barriers . . . and the long-
> standing culture of medical neglect–would largely subvert the effort and the system
> would still fall short of constitutional adequacy.

*Plata*, 2005 WL 2932253 at *27.

The Court has also entered specific remedial plans; and set and re-set firm deadlines for Defendants to meet, which have passed without any action. It has provided Defendants with technical assistance through court-appointed experts. The Court has set the case for quarterly hearings, and has set short-term compliance goals to make the process of reaching compliance more manageable. The Court ordered the parties to develop a strategic compliance plan, which if implemented would bring Defendants into compliance within 60 months. DE 946-1 (Implementation Plan and Estimated Timeline). Finally, the Court has given the BOC ready access to funds through the creation of the remedial account, which allows the Bureau to bypass the legislature to make capital improvements at the territory's prisons and jails. *See* DE 349 (Oct. 29, 2001) (as a contempt sanction, the Court ordered the Defendants to establish a remedial account and to deposit in it all monies received by the Government from the U.S. Marshal's Service for the housing of federal detainees in BOC facilities "with priority [for disbursements] given to expenditures mandated by all consent decrees, orders, judgments, and settlement agreements addressing conditions at Bureau of Corrections' facilities.").

All of the Court's efforts have had a negligible effect on conditions at the jail. There is little reason to believe that these steps if taken again would be anything more than "an exercise in futility." *Plata*, 2005 WL 2932253 at *27. In *Dixon*, the court likewise found "little-if-any-sustained success" though it had "taken a number of different tacks in an effort to force the District

to comply with the *Dixon* decree, including general consent orders, specific implementation plans with numerical targets, the appointment of an expert technical assistant, and the appointment of a special master." *Dixon*, 967 F. Sup. at 554.  As in *Dixon*, the Court should strongly consider concluding that the appointment of a receiver "is the only remedy available that presents any reasonable possibility of success [and] is the next logical step in the progression of remedies used in this litigation." *Id.*

> **3.     The Court's Continued Insistence on Compliance with its Orders Would Lead Only to Confrontation and Delay**

The Court has been extremely patient with Defendants during this litigation, and has provided them with substantial assistance through expert appointments and the creation of the remedial fund.  Despite all of this help, Defendants have proved themselves to be incapable of managing the CJC.  Without more, the Court's continued insistence that Defendants comply with its orders will lead to nothing but further non-compliance.  *See Newman*, 466 F. Supp. at 635 ("Time does not stand still, but the Board of Corrections and the Alabama prison system have for six years.  Their time has now run out.  The Court can no longer brook non-compliance with the clear command of the Constitution, represented by the orders of the Court in this case.").

The prospect of entering another remedial order, or setting new deadlines, "would only likely result in additional injunctions or contempt proceedings and would offer little hope of anything other than further confrontation and delays." *Shaw*, 771 F. Supp. at 763.  Defendants have abdicated their responsibility to provide adequate treatment and safe conditions for Plaintiffs.  This Court therefore is bound to step in now to "pick up the gauntlet," and stop this infringement on constitutionally protected rights. *See id.*

> **4.     There is No Reason to Expect that New Leadership Can Turn the Tide Within a Satisfactory Period of Time.**

Winnie Testamark was named new BOC Director by the Governor on February 9, 2019. Ex. A, Hr'g Tr. 77:6-14, Feb. 22, 2019 (Testamark).  She has over 20 years of experience working in the Miami Dade correctional system, culminating her tenure as a lieutenant.  *Id.* at 77:19-78:3. Notwithstanding Ms. Testamark's credentials, the odds that she will be able to turn the BOC around are low.

Ms. Testamark takes over from Rick Mullgrav.  He, too, was a seasoned correctional professional, with decades of experience in the Georgia Department of Corrections, before helming the BOC.  Ex. J, Hr'g Tr. 184:17–185:9, Dec. 9, 2015 (Mullgrav).  The challenges in reaching compliance proved too steep for Mr. Mullgrav.  In some important respects, the conditions at the jail deteriorated under Mr. Mullgrav's watch.  To provide just one example, at the close of Mr. Mullgrav's tenure, staffing had fallen to 29 officers, the lowest staffing level since this case was filed.  In fact, understaffing grew more acute *after* Director Mullgrav and the BOC developed a recruitment and hiring plan in 2018 to address staffing shortfalls.  *See* DE 1086 at 21-22 (documented the loss of 8 officers since the June 2018 staff recruitment plan was filed).

The fault cannot be laid entirely at Mr. Mullgrav's feet. Rather, bureaucratic hurdles and a profound and enduring lack of commitment from all parts of the Virgin Islands Government to remedy conditions at the CJC and in the territory have hampered compliance efforts.  To provide just one example, the Court should consider Defendants' ongoing failure to hospitalize chronically mentally ill patients now warehoused at the CJC.  This is hardly a new problem.  The 1994 Agreement sought to remedy it by requiring the timely hospitalization of mentally ill patients who could not be adequately treated at the jail.  *See, e.g.*, *Carty v. Farrelly,* 957 F. Supp. 727, 748 (D.V.I. 1997) (holding Defendants in contempt for, *inter alia*, failing to transfer forensic patients in need of hospitalization).  The Department of Health has flatly refused to accept BOC prisoners

21

at the Schulterbrant facility throughout the pendency of this case.  *See* Ex. C, Hr'g Tr. 19:4-22, Feb. 23, 2018 (Wallace).  The Department's commitment to open a brand new forensic facility at Anna's Hope must be viewed with great skepticism, since this is the very same plan Defendants presented, and were court-ordered to complete, fifteen years ago.  *See Carty v. DeJongh*, No. CIV. 94-78, 2007 WL 817607, at *31 (D.V.I. Feb. 27, 2007) (holding Defendants in contempt for, *inter alia,* failing to construct an in-territory forensic unit pursuant to previous remedial order).  Despite Defendants' twice being held in contempt of that court order, the Anna's Hope facility remains a pipe dream, the site as fallow as it was 15 years ago.

The Director alone cannot remedy the largest challenges facing the Bureau. That is why the Governor is the lead named defendant in this lawsuit.  He shares the responsibility with the Director, the warden, CJC supervisors, and line staff to ensure constitutional conditions for CJC prisoners, or to timely transfer them to an appropriate facility elsewhere.  The record in this case, however, is full of evidence about the lack of leadership among Defendants.  Fifteen years ago, the Court stated:

> What has happened and what I indicated that last time when we all talked, and it was worrying me things were not getting done, not getting done, and at that time I was beginning to have real concerns.  And I do have real concerns.  This is a travesty.  This is a shame.  And I don't know who is running it and who is not pushing and pushing, but that person is doing a disservice to the Virgin Islands and the people of the Virgin Islands.

(Ex. K, July 19, 2004 hr'g tr. at 14:4-10 (Brotman, J.)).

Just two months after that 2004 hearing, BOC Director John Trawick retired.  He was the ninth director to serve in the preceding twelve years. (Ex. L, Sept. 8, 2004 hr'g tr. at 60:6-11 (Swan)).  The Court provided the following instructions to Defendants as they considered Director Trawick's replacement:

> I mean, and especially here, where we have spent so much money in having services of people and effort in terms of time to try and build a system. I really think we need more of a degree of sophistication and understanding than we have been getting.  And I'm not in any way saying anything bad about the people who have served.  I think–I found many of them were very conscientious in what they wanted to do.  But you know, they're not professionals, and after a while there's the enormity of the situation and they just put their hands up and say, "I resign."
>
> The Administration may think they want to replace that person with somebody else.  It shouldn't be.  There are many, many people's lives who are involved. We are custodians of human beings who are involved.  We are custodians of human beings who, regardless of how bad they may be and how down upon the public looks at these people, they're still human beings . . . .  But there has to be somebody at the helm who will have behind him experience and have the wherewithal to do the job according to standards that are written, governing people who are directors of corrections all over the country.

(Ex. L, Sept. 8, 2004 hr'g tr. at 62:16-63:15 (Brotman, J.)

Since then, there have been no fewer than seven directors and acting directors of the BOC.[1] Each has vowed to steer the Government to compliance with the remedies in this case.  Each has fallen woefully short.  In light of this record, there is little reason to believe that the current leadership will be able to turn matters around quickly and begin, at long last, to provide adequate safety and treatment to CJC prisoners.  *See Plata*, 2005 WL 2932253 at *29 (appointing receiver where "[t]he past and current leaders of the prison system have failed to take bold measures necessary to protect the lives of prisoners, to find solutions to the impediments imposed by the State bureaucracy, and to make systemic improvements.").

> **5.      It is Unnecessary for the Court to Find that Defendants Have Acted in Bad Faith.**

In order to appoint a receiver, it is not necessary for the Court to find that Defendants have acted in bad faith.  *See Plata*, 2005 WL 2932253 at *31 ("While lack of will thus is a key

---

[1] In addition to Mr. Mullgrav and Ms. Testamark, this includes Joseph Ponteen, Rosaldo Horsford, Julius Wilson, Dewayne Benjamin, and Elwood York.

contributing factor to this crisis, the Court need not ascribe ill will to defendants as a predicate to appointing a Receiver, and the Court declines to do so."). The longstanding indifference Defendants have shown to prisoners' needs, their inability to run a safe jail, and the attendant costs in human suffering, are enough for this Court temporarily to take the jail out of Defendants' hands, and put a competent and dedicated professional in charge.

### 6. Defendants Have Wasted Resources by Failing to Implement the Remedies in This Case.

There is strong evidence that Defendants have wasted a huge amount of taxpayer money through their mismanagement of the jail. The Bureau is currently spending $12-15 million a year to house BOC prisoners in stateside correctional facilities, a staggering sum. Defendants have acknowledged that the Government must ship prisoners out of the territory because there simply is no facility in the territory that can safely house them:

> These off-islands prisoner transfers are necessary because the Virgin Islands does not have adequate correctional facilities to hold all classifications of prisoners; because of the deteriorating conditions at Golden Grove and the St. Thomas jail; and because of the chronic shortage of trained correctional officers.

Ex. G (Testimony of Testamark, W.) at 4.

The situation has grown more dire since Hurricane Irma hit in 2016, rendering the CJC Annex uninhabitable. Rather than build a new facility, Defendants continue to wait on the Federal Emergency Management Agency (FEMA) to declare the Annex sustained sufficient damage so that federal funds are authorized for its reconstruction. *See* Ex. A, Hr'g Tr. 84:22-85:21, Feb. 22, 2019 (Testamark). Meanwhile, millions of dollars are paid yearly to private facilities thousands of miles from the territory, money that could be spent to build a direct supervision facility in St. Thomas. Director Testamark acknowledged that building a new facility in St Thomas ultimately

will result in cost savings for the Government.  Ex. G at 1.  Yet, there are no concrete plans in place to do so.

The jail has been deemed too substandard by the U.S. Marshal's Service to house federal detainees there long-term.  *Carty v. Turnbull*, 144 F. Supp. 2d 395, 414 (D.V.I. 2001) (noting the possibility of Defendants being held in breach of the Marshal's Services Cooperative Agreement Program to house prisoners at the Annex and resulting loss of revenue).  Rather, federal detainees are only moved to the jail if they have pending court appearances; otherwise they are flown back and housed at a facility in Puerto Rico.  As a result, the territory has lost millions of dollars in potential revenue from boarding fees it is due under its agreement with the federal government.[2]

Defendants' plan to transfer chronically mentally ill prisoners to a privately-run facility in South Carolina is also wasteful.  Virgin Islands Department of Health (DOH) Deputy Commissioner Nicole Craigwell-Syms testified in November 2018 that the Government would pay Correct Care Solutions, Inc. $457.00 per day under the proposed contract to accept BOC patients.[3]  That results in a yearly bill of $2,427,250.00 just for the 14 patients Defendants identified last December.  This is almost a million dollars more than DOH currently pays to operate the Schulterbrant facility on behalf of 30 patients.[4]  The Government could construct and open a new facility at the Anna's Hope site in St. Croix (as Dr. Craigwell-Syms suggested was being considered) at the cost of approximately five years of payments to Correct Care for these 14 patients.[5]

---

[2] In 1997, Defendants signed a Cooperative Agreement Program (CAP) Agreement with the U.S. Marshal's Service to house federal detainees in BOC facilities in exchange for a per diem payment for each detainee, and $1,329,00.00 to renovate the Annex so that detainees could be housed there. *Carty*, 144 F. Supp. 2d at 412

[3] Ex. D, Nov. 28, 2018 hr'g tr. at 60:20-24 (Craigwell-Syms)

[4] *Id.* 62:23-63:3 (Craigwell-Syms)

[5] *Id.* 64:23-65:4 (Craigwell-Syms)

But costs cannot be measured only in taxpayer dollars or revenue.  There has been a real cost paid by prisoners who have had unnecessarily to suffer at the jail.  Over thirteen years ago, the Court recognized this human cost and suggested that the Government needed expert assistance to operate its correctional facilities:

> I'm distressed it takes so long to fill the staffs, the process, the process of staffing, and the process by which certain things could operate certainly has to be revised in my opinion. . . .  It should not take ten years to do what we've been trying to do here.  And in some way, there has to be an efficient expert to come in somewhere and expedite the process of obtaining funds and utilizing the funds from the government. . . .  And costs are not only measured in loss of moneys, but they can be measured in loss of lives or the types of life that, insofar as corrections are concerned, although minimal, that these prisoners are entitled to.  They're still human beings.

 (Ex. M, Jan. 10, 2006 hr'g tr. at 68:9-22 (Brotman, J.)).

The last best resort for the prisoners and the Government is for this Court to step in and appoint a receiver until such time as Defendants prove themselves capable of running a constitutionally adequate jail.

### 7.    A Receiver Could Remedy the CJC More Quickly than the Status Quo.

The job facing a receiver appointed here is daunting.  The receiver must understand the scope of the problems with the jail, and how the jail and the Bureau of Correction operate; grasp the interests of all of the stakeholders, and navigate the various bureaucracies to move matters forward.  However, "[o]nly a receiver varies significantly from what the Court has tried unsuccessfully so far."  *Dixon*, 967 F. Supp. at 554.  There are keen advantages the receiver will enjoy.  Most importantly, the receiver, unlike an agency head or employee who serves at the will of the Governor, will carry the power and support of the Court, and will therefore be able to cut through the bureaucratic inertia that has gripped Defendants for the past twenty-five years.  *See id.* ("Only a receiver provides the Court with enough day to day authority to force compliance without

causing confusion and ambiguity in the administration.").  Plaintiffs share the *Plata* court's belief that "steady progress here under the direction of a Receiver is possible, that gains in . . . care will be made along the way, and that this is far preferable to the current state of paralysis."  *Plata,* 2005 WL 2932253 at *31.

### B.      The Court Should Consider Other Remedies As It Considers the Appointment of a Receiver.

It is clear that the Court must take more assertive action now to propel Defendants towards compliance with the Decree.  Appointment of a receiver is not the Court's only option, however, and should be reserved for situations where all other options have failed or would be futile.  *See* Part I, *supra.*

The Court can enter specific remedial orders to address the areas of greatest concern as to compliance.  *See Brown,* 563 U.S. at 542 (noting a court's "continuing duty and responsibility to assess the efficacy and consequences of its order," which may require "modification or amendment of an earlier decree.").

The Court can also hold Defendants in contempt, which then empowers the Court to enter sanctions.  *See Carty v. Schneider*, 986 F. Supp. 933, 939 (D.V.I. 1997)  ("[T]he law affords courts great and sound discretion in fashioning an appropriate sanction for contempt.").  The Court may exercise its equitable contempt power and order that the sanction be used to remedy the problems underlying the contempt finding.  *See Carty,* 986 F. Supp. at 939 n. 12 (citing *Local 28 of Sheet Metal Workers Int'l Ass'n  v. EEOC*, 478 U.S. 421 (1986)).  The Court may also impose coercive contempt sanctions, which are prospective fines intended to spur the contemnors into obedience by penalizing them for future violations of lawful orders. *Harris v. City of Philadelphia*, 47 F.3d

1311, 1328 (3d Cir. 1995).   Finally, the Court may also require the contemnor to perform affirmative acts, even acts not required by the initial consent decree.   *See Carty*, 957 F. Supp. at 747 (citing *In re Arthur Treacher's Franchise Litigation*, 689 F.2d 1150, 1159 (3d Cir. 1982)).

There are two big-ticket tasks facing Defendants that will be key to their reaching compliance with the Decree.   The first is constructing a new direct supervision facility.   The second is opening up forensic beds in the territory to house and treat chronically mentally ill BOC prisoners.   Each will require careful planning, substantial initial resources (though each will result in cost-savings), and coordination across Government departments.   Defendants have shown themselves unwilling and incapable of even initiating either project.   The Court should strongly consider entering a remedial order requiring that both projects be completed within a reasonable time period.   The remedial order can set firm deadlines for project development, funding, staffing, and completion.   The Court has the inherent equitable power to enter that order today.   Or, it could do so pursuant to its contempt powers.

Premising the remedial order on a contempt finding has a number of advantages.   It would empower the Court to levy contempt fines against the Government that could be used to fund these construction projects.   Should Defendants not meet deadlines or otherwise fail to comply, coercive fines could be used to spur compliance.   In the context of prison litigation, courts have imposed substantial coercive and compensatory fines for failure to comply with orders to remedy prison overcrowding and unconstitutional conditions of confinement.   *See, e.g., Harris v. City of Philadelphia,* 47 F.3d at 1332 (affirming $548,000.00 fine); *Alberti v. Klevenhagen*, 46 F.3d 1347, 1360 (5th Cir. 1995) (upholding $50.00 daily coercive contempt fines for each inmate over population cap upheld in prison conditions case); *Essex County Jail Inmates v. Amato*, 726 F.

Supp. 539, 550 (D.N.J. 1989) (levying fines in excess of $3,000,000.00 for violations of population and exercise provisions).

These options (receiver, remedial order, and contempt) can also be sequenced. For example, the Court could first find Defendants in contempt of the Decree. As a contempt sanction, the Court could enter a remedial order requiring construction of the new jail and opening of territorial forensic beds. The Court could also levy contempt fines that provide initial funding for these projects. The receiver appointment could then be held in abeyance pending Defendants' compliance with the contempt order. Plaintiffs urge the Court to consider all of these options in crafting an order that will spur Defendants to comply with the Decree.

## III.    THERE IS ALREADY A SUFFICIENT RECORD TO SUPPORT ADDITIONAL REMEDIES, INCLUDING APPOINTMENT OF A RECEIVER.

The Court also asked the parties to address whether it should schedule this matter for a show cause hearing on the appointment of a receiver. For the past three years, the Court has held evidentiary hearings every three months and taken evidence on current conditions at the jail. To date, fifteen quarterly hearings have been held. These hearings addressed both Defendants' compliance with goals set for that quarter, as well as "testimony and evidence as are necessary to apprise the Court fully of the status of the Consent Decree." DE 833 at 4. The Court therefore has a comprehensive record of conditions at the jail as of February 22, 2019, the date of the last hearing. This record as to Defendants' compliance is sufficient to determine whether to appoint a receiver, find Defendants in contempt, or enter a remedial order implementing the Decree. The Court could order the parties now to submit proposed findings of fact and conclusions of law based on the existing record. To the extent the Court wishes to take more evidence, it can and will do so at the upcoming quarterly hearing now scheduled for May 24, 2019.

Respectfully submitted,

/s/ **ERIC BALABAN**

Eric Balaban

National Prison Project of the ACLU Foundation

915 15th Street

Seventh Floor

Washington, D.C. 20005

(202) 393-4930


*Attorneys for Plaintiffs*

Dated: April 15, 2019

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 15, 2019, a true and correct copy of the foregoing pleading and appended declaration and exhibits were served by the Notice of Electronic Filing administered by this Court to the following counsel for Defendants at the following address:

Carol Thomas-Jacobs
Assistant Attorney General
V.I. Department of Justice
Office of the Attorney General
8050 Kronprindens Gade
St. Thomas, VI 00902
<u>carol.jacobs@doj.vi.gov</u>

Shari D'Andrade
Special Assistant Attorney General
V.I. Department of Justice
Office of the Attorney General
6040 Estate Castle Coakley
Christiansted, VI 00820
<u>shari.d'andrade@doj.vi.gov</u>

<u>/s/</u> **ERIC BALABAN**
Eric Balaban