## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

LAWRENCE CARTY, ET AL.,        )

          )      **CIVIL NO. 1994-78**

       Plaintiffs,        )

          )

       vs.        )

          )

GOVERNOR ALBERT BRYAN, JR., ET AL.,    )

          )

       Defendants.        )

          )

## COURT-ORDERED BRIEF REGARDING CONSIDERATION OF RECEIVERSHIP

**COME NOW**, Defendants, by and through undersigned counsel, and hereby file their court-ordered brief. On February 22, 2019, at the conclusion of the quarterly evidentiary hearing, the Court ordered the parties to brief whether the appointment of a receiver should be considered given the history of this case. Defendants, incorporate by reference, all of their previously filed quarterly goals status compliance reports and the 2013 Settlement Agreement.

### I. RECEIVERSHIP IS UNWARRANTED AND A DRASTIC REMEDY TO CONSIDER

Consideration of receivership must be evaluated from the period when the Court adopted and entered the parties' 2013 Settlement Agreement as an enforceable order in 2013, D.E. 780. The 2013 Settlement Agreement requires broad, systemic improvements at the St. Thomas jail encompassing: safety and supervision, medical and mental health care, fire and life safety, programs, and environmental health and safety. Despite Defendants' noted challenges, including the destructive 2017 hurricane season in which several government assets were destroyed, at least one officer perished, Defendants have made meaningful strides towards compliance. Since the establishment of quarterly goals, Defendants have taken a targeted, strategic approach to remedying the jail conditions. Specifically, Defendants have developed security and mental health policies that have been approved by the Court-appointed experts. Defendants successfully trained

staff and implemented those policies.  And, Defendants created audit tools to measure compliance with the policies.  Defendants also created and hired critical positions to support and sustain the compliance efforts.  Conditions at the jail continue to improve.  Importantly, since the Court's adoption of the 2013 Settlement Agreement, Defendants have not been held in contempt.

Receivership should not be considered, because Defendants have not had a reasonable amount of time to comply with the 2013 Settlement Agreement.  Over the course of the past six years, Defendants have been diligently implementing widespread reform.  Full compliance with the Settlement Agreement cannot happen overnight.  It takes steady, deliberate efforts to ensure sustainable compliance.  Because of the incremental progress at the jail, there is no basis to doubt that conditions would be not remedied by continued progress within the context of 2013 Settlement Agreement compliance.

## II. DEFENDANTS' MOST RECENT PROGRESS TO PROVIDE ADEQUATE CARE AND SUPERVISION FOR ITS MOST VULNERABLE POPULATION

### a. CONVERSION OF THE HOUSING UNIT DESIGNED FOR MENTALLY ILL PRISONER TO DIRECT SUPERVISION

Cluster 1 is the designated housing area for the mentally ill.  Currently, indirect supervision management model is used to supervise this population.  Under the indirect supervision model, correctional officers monitor the prisoners from a control booth and interaction with prisoners was limited.  However, under contemporary correctional best practices, direct supervision is the preferred management style.  Direct supervision is a combination of the physical design of a housing area and the prisoner management style.  Staff interact continuously with prisoners in the housing unit, actively supervision them to identify and address problems in their early stages.  Research shows that direct supervision focuses on actively managing prisoners and produces a jail that is safe and secure for prisoners and staff.  Direct supervision has led to an overall reduction in assaults and other serious incidents due to the officer's presence inside of the housing unit.  *See,*

*e.g.,* Wener, Richard. 2005. *Effectiveness of the Direct Supervision System of Correctional Design and Management.* American Association of Correctional and Forensic Psychology. Plaintiffs have vehemently advocated that Defendants employ direct supervision management of the prisoner population. *See e.g.,* Plaintiffs' Motion to Add Quarterly Goals, D.E. 1018. Now, it is being done.

To pilot implementation, on February 22, 2019, Jail management to include, the Director, Assistant Director, Classifications Supervisor, Mental Health Coordinator and Warden met to discuss the renovation of Cluster 1 into a direct supervision housing unit. The Warden, in collaboration with the Mental Health Coordinator, established a list of officers that exhibit the appropriate temperament and who voluntarily want to manage this population. **EXHIBIT 1.** Contractors assessed Cluster 1 on March 6, 2019 and submitted scopes of work and cost estimates. Defendants selected the contractor on March 15, 2019 and work began on March 20, 2018. Cluster 1'a renovation was completed on April 12, 2019. **EXHIBIT 2.** On April 5, 2019, Defendants began the development of the post order for this Cluster. To support the pilot implementation, on March 25-29, 2019, Defendants provided crisis intervention team training, providing the tools, strategies and techniques that will allow corrections staff, mental health service staff to work develop and implement a crisis intervention team. **EXHIBIT 3.** This training will assist in the reduction of crisis situations, enhanced security management of the mentally ill prisoners, improve safety, and promote better outcomes for persons with mental illness. Staff learned about improved management and care for this special population. Defendants also advised Dr. Burns and Mr. Bogard of this move towards direct supervision in Cluster 1 and the parties are in communication to ensure the success and sustainability of this critical measure. Defendants have also contacted the National Institute of Corrections for technical assistance to support this pilot implementation.

**b.  Timely Transfer of Mentally Ill Prisoners**

The Settlement Agreement requires that Defendants timely transfer mentally ill prisoners in need of long-term or intermediate care.  On March 8, 2016, Defendants transferred five mentally ill prisoners to Saguaro Correctional Center, an accredited facility that provides a higher level of comprehensive medical and mental health care than the St. Thomas jail.  Saguaro Correctional Center has the full complement of necessary health professionals.  Corrections officers at Saguaro Correctional Center receive pre-service training that covers mental illness, including presentation of signs and symptoms indication the possible presence of a mental health emergency and suicide prevention.  *See* Defendants' Report Regarding Defendants' Quarterly Goals, D.E. 906.

Defendants also identified a facility in the mainland, Columbia Regional Care Center - Correct Care Solutions, a forensic facility to provide the requisite care for seriously mentally ill prisoners.  In 2018, Defendants transferred a seriously mentally ill prisoner, adjudicated not guilty by reason of sanity ("NRGI"), G.L. to Columbia Regional Care Center – Correct Care Solutions. Moreover, Defendants developed an Interim Plan for Timely Transfer of Seriously Mentally Ill Prisoners in Need of Intermediate or Inpatient Care to Appropriate Stateside Psychiatric Facilities. Defendants identified fourteen prisoners, including on NGRI, that are in need of intermediate care. Full execution of the contract with the mental health facility is imminent and the prisoners will be transferred.  *See* Defendants' Response to Court Order, D.E. 1070

### c.  Collaboration with the Department of Health and Schneider Regional Medical Center

For the duration of this case, Defendants have been in communication with the Department of Health and Schneider Regional Medical Center to advance the continuity of care for the mentally ill prisoners.  In 2017, Defendants began have regular, scheduled meetings with both agencies to achieve the overarching goal.  In 2018, Defendants revised an existing Memorandum of Agreement with the Department of Health regarding medical and mental health care services

4

for prisoners in the Bureau of Corrections' custody. **EXHIBIT 4.** Defendants also revised an existing Memorandum of Agreement with Schneider Regional Medical Center and maintain regular communication to discuss specific prisoner transfers and care. The Memorandum of Understanding outlines joint efforts to address medical and mental health care needs of prisoners and specifically, to provide for medical and mental health treatment, evaluation, and stabilization including inpatient hospitalization. As a result, there is a documented, increased concerted effort to provide timely and adequate care for the mentally ill prisoners, including timely hospital admission of prisoners in need of acute stabilization.

### d. Mental Health Policies

Defendants have successfully drafted, trained and implemented mental health policies. These policies ensure: adequate and timely intake screening for mental health needs upon arrival at the jail; comprehensive initial assessments; adequate and timely referral to specialty and off-site care; and adequate suicide prevention; a protocol for medical and mental health rounding in segregation cells to provide prisoners access to care and to prevent decompensation. They also require review by and consultation with a qualified mental health professional of proposed prisoner disciplinary sanctions to evaluate whether mental illness may have impacted rule violations and to provide that discipline is not imposed due to actions that are the product of symptoms of mental illness. Additionally, the policies cover mental health care and clinical treatment, including timely, current and adequate treatment plan development and implementation, mental health programs for all prisoners with serious mental illness. Defendants have also developed and implemented memoranda of understanding to ensure timely transfers of seriously mentally ill prisoners in need of inpatient or intermediate care, or those in need of acute stabilization, to an appropriate hospital or mental health facility; adequate psychotropic medication practices; and implementation of

specific policies on the use of seclusion or restraints on mentally ill prisoners consistent with professional guidelines.   Furthermore, the Warden drafted, issued and trained staff on a memorandum regarding the general practice of managing seriously mentally ill prisoners on lockdown.  *See* Defendants' Status Report for the Quarter Ending on August 4, 2017, D.E. 969. The memorandum, which was later converted into a directive, covers pat searching these special prisoners, communication to main control about movement, distribution of medications, increased security measures and restraint procedures.  *See* Defendants' Status Report for the Quarter Ending on May 4, 2018, D.E. 1007.

In November 2018, Defendants, with technical assistance provided by Dr. Burns, developed protocols regarding the use and administration of emergency and non-emergency medication.  Dr. Burns found that "[n]o other mental health policies and/or forms were completed in a timeframe of a single quarter and Defendants, and specifically mental health coordinator, Ms. Warren are recognized for this accomplishment."  D.E. 1047-1 at 7.  Dr. Burns also stated that "[i]n addition to the finalized policy, all ten required forms were also completed which represents quite an accomplishment in the space of a single quarter."  *Id.*  Defendants commenced training staff on this policy.

### III.   DEFENDANTS HAVE MADE POSITIVE STRIDES TOWARD FULL COMPLIANCE

Since the adoption of the 2013 Settlement, Defendants have validated an objective classification instrument to ensure that prisoners are appropriately classified and housed.  The instrument was also updated to fully incorporate the Court-appointed Classification Expert, Dr. James Austin's recommendations.  *See* Defendants' Four Month Status Report, D.E. 797-1. Defendants finalized the Classification Policy, which was approved by Dr. Austin.  The Warden implemented weekly review of prisoners placed in segregation.  This weekly review occurs in

addition to the monthly reviews conducted by the Segregation Review Committee.  Defendants continue to collect and periodically evaluate data concerning prisoner-on-prisoner assaults, prisoners who report gang affiliation, the most serious offense leading to incarceration, prisoners placed in protective custody and reports of serious prisoner misconduct.  To ensure that prisoners are timely and fairly disciplined, in 2015, the Warden appointed an officer as the disciplinary hearing chairperson to lead the disciplinary hearing committee and disciplinary process.

Under the Settlement Agreements, Defendants must develop fire evacuation procedures and conduct a full scale evaluation. 2013 Settlement Agreement, Section IV.D.1.  In 2015 Defendants, in conjunction with various territorial law enforcement agencies, successfully conducted a full-scale fire evacuation drill based on the draft fire evacuation procedures.  *See* Defendants' Report Regarding Defendants Quarterly Goals, D.E. 860.

Defendants developed medical policies that address: access to care; continuous quality improvement program; notification of serious illness or injury and procedure in event of death; grievance mechanism for health complaints; patient safety; infection control policy; transfer screening; health assessments; oral care; nonemergency health care request and services/sick call; emergency services; segregated prisoners; nursing assessment protocol; continuity of coordination of care during incarcerations; discharge planning; medical diets; basic mental health services; intoxication and detoxification related to drug and alcohol; contraception; counseling and care of the pregnant inmate; medical records format and content/health information management; confidentiality of clinical records and information; chronic disease management; and medical placement form.  *Id.*

### a.  PROCUREMENT OF SECURITY EQUIPMENT

Defendants have acquired the following contraband screening tools/security equipment: x-ray machine for the detection of contraband, mental detector handheld wands, handheld cameras to document confiscated contraband and for proper reporting of use of force, wrist restraints, ASP batons, functional handheld radios for communication to and from corrections assigned to housing units.  Defendants also procured additional correctional staff and prisoner uniforms.

### b. SECURITY ADMINISTRATIVE DIRECTIVES, POLICIES AND TRAINING

Defendants developed the following administrative directives and policies to immediately address concerns with supervision, discipline, and security of the facility:

- Housing Unit/Cluster Rounds, to ensure consistent and accountable security rounds that protect prisoner safety and maintain facility security.
- Maintaining Cluster/Housing Assignments, to ensure ongoing observation and supervision of prisoners in clusters/housing units and to safeguard facility security, staff assigned to a housing unit control will remain at their posts at all times unless properly relieved;
- Contraband control, procedures to eliminate the presence of dangerous material in the jail and confiscation and proper preservation of evidence.
- Pre-hearing detention and related lockdowns, to ensure consistent and accountable practices concerning individual lockdowns of prisoners after incidents and prior to a disciplinary hearing
- Completion of the use of force incident reporting form- to ensure an accurate, adequate and consistent approach to reporting all incidents involving use of force by staff on prisoners
- Keep Separates List, to ensure consistent and accountable practices concerning maintaining an accurate and timely Keep Separate List that identifies which prisoners must be kept separate from others;
- Outdoor Recreation- to ensure consistent and accountable practices related to providing outdoor recreation for prisoners
- Use of Force Alternatives and De-Escalation- to ensure consistent and accountable
- Prisoner Discipline, to ensure that the disciplinary process used to enforce the jail's rules and regulations are fair and equitable.
- Hospital Security Protocol-to ensure the safety and security of prisoners, staff and the public when prisoners are transported to and from the hospital and while in the hospital.
- Intake
- Suicide Prevention
- Managing Prisoners on lockdown
- Prisoner Grievance Process
- Emergency Preparedness Plan

Defendants successfully trained the staff on the above administrative directives and policies. Defendants also drafted the following policies: Incident Reporting, Inmate Bedding and Clothing, Visitation, Mail, and Contraband.   Moreover, Defendants, in collaboration with Mr. Bogard, developed a list of security policies in order of priority and policies will be developed in the order listed.

Recently, on November 2, 2018, the Defendants were required by court-order to achieve a significant number of goals—the most in any single quarter.   During this period, Defendants finalized the following use of force policies: spit hoods, cell extractions, video recording, and restraint devices.   Defendants also finalized the hurricane emergency policy and drafted the use of force reporting requirements policy.   Moreover, Defendants finalized comprehensive training materials, including scenario based training modules, for the following policies: Use of Force Umbrella, Administrative Investigations, and Use of Force-Spit Hoods.   Defendants trained staff on the Administrative Investigations policy.   Training addressed the processes for interviewing and disciplining employees; investigatory stages; and criminal referrals.

To support forthcoming training and sustained compliance, Defendants distributed the finalized policies and developed a training plan to ensure that staff are adequately trained to carry out the requirements of the policies.   Mr. Bogard, the Court-appointed expert, lauded Defendants efforts and in his report stated:

> [d]espite the substantial volume of goals and the associated work that embodies the development and review processes, abundant progress has been made by BOC. Policies have been extensively vetted and are very good, as are the training materials. . . . BOC has done an excellent job creating sound, professional and practical training materials as necessary to meet those respective goals . . . BOC [ ] has performed admirably this quarter in terms of both the number of goals they achieved and the high quality of the policies and training documents they produced.

12th Security Goals Assessment for the Quarter Ending November 2, 2018, D.E. 1046-1 at 6-7.

## IV.     SIGNIFICANT IMPROVEMENTS NOTED BY THE COURT-APPOINTED EXPERTS

In addition to their respective Quarterly Reports, the experts filed comprehensive compliance assessments that analyze Defendants' efforts and overall compliance with the 2013 Settlement Agreement.  Mr. Bogard's most recent report, the Final 5th Security Report, filed on May 19, 2017, D.E. 957-1, found the following progress:

> **There has been improved operational adherence to eight Administrative Directives that guide essential operational requirements**.  The eight administrative directives, addressing such topics as contraband control, use of force reporting, de-escalation and force alternatives, etc. were intended to be interim measures and ultimately to be incorporated in official, formal policies/procedures. That said, they have carried the weight of policy and we have seen incremental improvement in many aspects of these essential functions and activities set forth in the directives.
>
> . . .
>
> **Substantial Progress on the Plan to Replace CCTV System at the Jails.**  The BOC developed specifications, a project budget, and estimated time frames for replacement of the CCTV system at the CJC and Annex to fulfill a court-approved quarterly goal.  As of September 2016, $346,000 was authorized for this project and the vendor selection process was initiated in January 2017 after proposed were received from multiple firms.
>
> . . .
>
> **Enhanced employee accountability has occurred.**  Over the past six months we have seen a significant increase in corrective measures and discipline of employees found to have violated policies or the BOC's Code of Conduct.
>
> **Audit instruments were developed to evaluate compliance with each of eight administrative directives and all were field tested as required by a quarterly goal.**  BOC dedicated substantial resources in the process of working with me, and with Plaintiffs' counsel, to draft audit tools as required by this case and as necessary to enhance internal quality assurance.  That was followed by the actual field testing of the instruments, which served to highlight areas in which changes need to be made to enhance the audit tools and process for future use.
>
> . . .
>
> There has been incremental progress toward compliance since we were on-site in May 2016, and since we issued our last Assessment (Report No. 4) in August 2016. It is evinced by clear progress made toward implementation of eight critical administrative directives at the CJC until policies/procedures—one of the formal systems of accountability required by the Settlement Agreement—are in place.  The

BOC marginally increased the total number of provisions earning a 'partial compliance' rating snice the Fourth Security Report.

. . .

Since the Fourth Security Report, improvements . . . include: (1) obtaining funding and identifying qualified vendors to replace the Jails' CCTV systems; (2) providing staff with suicide prevention training—including on use of the cut-down tool; (3) implementation of a PREA policy and plan; and (4) implementation of several administrative directives that impose requirements and emphasize guidelines for various aspects of security, safety and accountability.  During our site visit in January 2017, we again observed practice and assessed evidence of steps BOC is taking to address findings and recommendations from the preceding Security Reports, including having made real improvements in key control practices.

. . .

Assigned staff were able to demonstrate that control panel indicator lights for three cluster control rooms were consistently working and were able to confirm the status of doors and gates as being locked or unlocked, which is considered a sustained improvement initially identified in the Fourth Security Report.

. . .

During our site visit in January 2017, [  ] there was noticeable improvement in the escorted movement of prisoners.

. . .

During this reporting period, we reviewed a little random sample of housing logbooks while we were onsite in January 2017 and found improvements relative to the frequency and documentation of 30-minute rounds in general population housing areas.  For Clusters 2,3, and 4, there was documented evidence of security rounds and cell checks being made approximately every 30 minutes.

. . .

Based on our site visit in January 2017 and upon offsite review of applicable monthly report documents, improvements since the 4th Security Report include: (1) substantial increases in the number of shakedowns of cells, cluster dayrooms, common spaces such as showers, facility programs and services areas, emergency stairwells, vehicles, employee breakroom, ice machines and other agency property; (2) there is a revised facility shakedown schedule for each shift that is based on a memorandum issued by the warden; (3) while on-site, we observed positive examples of officers performing pat-down searches when prisoners were leaving their assigned housing unit for outdoor recreation and other activities and upon return; (4) a separate incident report is consistently prepared for each shakedown

conducted; and (5) the audit tool develop for AD-2015-11 Contraband Control was field tested.

. . .

**[ ] [T]here has been significant improvement over the past six months relative to the requirement that CJC prisoners are afforded opportunities for outdoor recreation at least one hour per day, six days per week. . . .** Our reviewed of the BOC's monthly recreation logs reflect significant improvement compared to previous reporting periods . . . .  We continue to observe improvement regarding cluster officers recording the names of prisoners attending outdoor recreation, those refusing outdoor recreation, or the reasons for cancellations in the housing logbooks and/or recreation log.

[T]here is incremental improvement by staff in reporting the forms of use of force alternatives and de-escalation techniques applied to minimize the needs for force.

. . .

Significant changes and improvements the BOC made include: (1) revision and implementation of a new use of force report form that includes a supervisor's supplement and a dedicated section titled Supervisors/Managers Review of Use of Force Report; and (2) development and field testing of audit tools for AD-2015-6-R and AD-2015-10 to assess compliance with requirements involving supervisory/administrative reviews.

D. Bogard, Final 5th Security Reports, D.E. 957-1 at 20-21, 57, 67-68, 74, & 86 (emphasis in the original).

Dr. Burns' most recent mental health comprehensive assessment finds the following provisions of the Settlement Agreement in partial compliance: intake screening; suicide prevention; timely medical and mental health care consistent with community standards, constitutional requirements, including screening, assessment, treatment, monitoring; medical facilities, including scheduling & availability of appropriate clinical space with adequate privacy; timely, current & adequate treatment plan development & implementation; develop & implement MOUs to ensure timely transfers of SMI in need of inpatient or intermediate care, or those in need of acute stabilization, to an appropriate hospital or MH facility, comprehensive correctional &

clinical staff training & a mechanism to identify signs and symptoms of mental health needs of prisoners not previously assigned to mental health caseload.  K. Burns, Fifth Mental Health, D.E. 1071-1.

### V.   DEFENDANTS' RESTRUCTURED RECRUITMENT AND RETENTION EFFORTS WILL YIELD POSITIVE OUTCOMES

Section IV.N. of the 2013 Settlement Agreement requires that Defendants employ sufficient "custody staff to (a) provide for the safety and security of all prisoners, (b) respond to emergencies, and (c) permit foreseeable staff illness, leave, attrition and training.  D.E. 765-1 at 12.  Two historic impediments to recruitment has been the starting salary and the entrance examination.

#### a.   CORRECTIONS OFFICER SALARY

In past years, the Bureau was unable to attract new corrections officers because of the salary.  Since 2016, Defendants have increased the starting salary for the corrections officer position and have implemented raises for the existing officers.  Currently, the starting salary is further raised to $40,000.00.  This new salary is competitive with the average correction officer's salary in the mainland.  Moreover, pursuant to an October 19, 2018 executive order, Defendants implemented a 3% cost of living increase for all Non-Union classified and Exempt employees which, includes the Warden, Assistant Warden, and Chief.

#### b.   EXAMINATION

The low corrections entrance exam passage rate has been a barrier.  To increase applicants' performance on the corrections officer exam, beginning in April 2018, Defendants provide an online preparation manual and practice test.

Contemporaneously, in December 2018, Defendants partnered with the University of the Virgin Islands to develop and administer a new entrance examination for corrections officers.

**EXHIBIT 5.**  The University of the Virgin Islands ("UVI") has a keen understanding of the prospective Virgin Islands applicant pool and will use responsive approaches to ensure greater performance results.  The examination will be customized to test the abilities and competencies essential to the corrections officer position.  The exam will be administered on a more frequent basis, which can be increased based on applicant interest.  Thus far, UVI has provided the draft corrections officer examination that Defendants are currently reviewing.  Once Defendants approve the examination, it will be validated and based on the feedback from the validation, the examination will be revised accordingly.  Defendants anticipate offering the new corrections officer examination in late 2019.

### c. DEFENDANTS FILLED CRITICAL POSITIONS NECESSARY TO ATTAIN COMPLIANCE

In addition to corrections officers, Defendants must have sufficient civilian staff to implement the requirements of the 2013 Settlement Agreement.  Defendants are required to retain a qualified medical director responsible for overseeing the health care program at the Jail, a physician board certified in internal medicine for a minimum of 10 hours weekly to conduct intake screenings, physical exams, sick call and medical assessments and follow-up exams.  When not present at the facility, the physician shall be on-call.  In 2015, Defendants hired a medical director with over 25 years of experience in internal medicine, who is on-call and on-site in excess of 10 hours weekly.

Section V.2.a.m.iii. of the 2013 Settlement Agreement requires that Defendant retain a full-time registered nurse to act as the on-site supervisor.  Defendants currently employ two registered nurses, one of which is head nurse, and one licensed nurse practitioner.  Section O of the 2013 Settlement Agreement governs fire life safety and the development and implementation facility-

specific policies regarding the physical plant, emergency preparedness, and fire life safety equipment and systems.  Defendants hired a Fire Life Safety Manager in 2017.

On December 11, 2017, Defendants hired a Training Administrator with over 27 years of correctional education, training, staff development, and program development experience. Notably, Defendants' Training Administrative developed the training materials on the use of force policies.  The training combined lecture, group discussion, psychomotor and cognitive group and individual activities, as well as scenario based training specifically required by the Settlement Agreement.  Defendants' Training Plan, D.E. 1079-1.  Mr. Bogard, in his evaluation of the training materials found that Defendants' Training Administrator "ha[d] done an excellent job creating sound, professional and practical training materials."  12th Security Goals Assessment for Quarter ending November 2, 2018, D.E. 1046-1 at 6.  Moreover, under the Training Administrator's oversight, between July-September 2018, Defendants conducted the following training: Taser Instructor Course, Taser-Evidence and Analysis Collection, ASP Baton, Flashlight and Handcuffing Instructor Course, Glock Amorer's Course, and Glock Firearms Instructor Course. These trainings were conducted by leaders in the industry, AXON (formerly known as Taser International), Glock International, Sabre Security Equipment Corporation, Armament Systems and Procedures-ASP, Inc., and have certification requirements that include a written and competency based components.

Section C.1.b. of the 2013 Settlement Agreement requires that Defendants develop and implement facility-specific policies addressing the Prison Rape Elimination Act ("PREA"), 42 U.S.C. §15601 et seq.  PREA is federal law intended to deter the sexual assault of prisoners.  PREA implementation at the Jail requires that a PREA Coordinator to develop, implement, and oversee Defendants' efforts to comply with the PREA standards.  28 C.F.R. Part 115.11.  Defendants hired

its PREA Coordinator in 2016 who has completed the following measures to comply with PREA: via memoranda of understanding ("MOU"), provided multiple internal and external ways to report incidents of sexual abuse and sexual harassment, appointed PREA Compliance Managers to coordinate the Jail's efforts to comply with the PREA standards, formed a Sexual Assault Response Team to address sexual abuse on the facility level, established a MOU between the Bureau of Corrections and the Virgin Islands Police Department's Victim/Witness Advocate Unit to serve as the Bureau's outside reporting agency; conspicuously posted signs about Defendants' zero tolerance towards sexual abuse and sexual harassment in English, Creole and Spanish; implemented the distribution of brochures informing all new prisoners about sexual abuse, harassments and services available, completed background checks for all sworn and civilian staff; staff and prisoners were trained on the general PREA guidelines; containing information on sexual abuse and sexual harassment and services.

Several provisions of the Settlement Agreement require that Defendants conduct administrative investigations of policy violations, staff misconduct, sexual assault, sexual abuse, contraband, and excessive use of force.  2013 Settlement Agreement Section IV. D.1.f.; H.1.m.; &K.  Defendants hired a Chief Inspector on August 13, 2015 who has a wealth of knowledge and training in investigations.  The Chief Inspector previously served as a police officer for 25 years, which included 12 years as the Chief of Police.  The Chief Inspector also received extensive training at the Federal Bureau of Investigations and the Federal Law Enforcement Training Centers.  Since his employment with the Bureau of the Corrections, the Chief Inspector has investigations the incidents of uses of force at the Jail and other significant incidents.  Defendants rendered disciplinary sanctions because of those investigations.

In addition to civilian and correctional staffing, policies, training and implementation, compliance requires funding in excess of the annual budget allocated to the Bureau of Corrections for the procurement of security equipment, repairs, and renovation of housing units, etc. Therefore, Defendants hired a Programs and Grants Manager on December 7, 2015.  Defendants have applied for many grants and were awards grants targeted towards PREA compliance, security training, training equipment, security equipment, substance abuse programs, the procurement and installation of additional security surveillance cameras, funding to support a civilian programs position.

Furthermore, Defendants must "monitor the progress of this Agreement by utilizing a Compliance Officer assigned to the St. Thomas District.  The compliance officer shall be responsible for reporting, inspecting and assisting with compliance." *See* 2013 Settlement Agreement, Section VII. ¶ 11.  On January 12, 2014, Defendants hired a Compliance Coordinator dedicated to coordinating compliance efforts and activities, measuring, reporting, assisting, and recommending corrective action on compliance with the Settlement Agreement.  In addition, Defendants hired a Prison Compliance Officer on June 25, 2018, assigned to the Jail, to monitor and report day-to-day operations and acts as the facility's PREA compliance manager.  Their work involves establishing Jail goals and objectives, developing policies and procedures, priorities, standards for achieving established goals, and extensive collaboration with Defendants' medical and mental health professionals, Jail and agency management and legal counsel.

Defendants shall also offer congregate religious services and shall allow prisoners to have items necessary to practice their religious beliefs.  In furtherance of this mandate, Defendants ceased contracting for these services and hired a Prison Chaplin on July 30, 2018.  Prison Chaplin was instrumental in enhancing the housing units through the procurement of new televisions.  The

Prison Chaplin also organizes special religious events, inviting community churches into the Jail for fellowship with the prison population. **EXHIBIT 6.**

### VI. EVALUATION OF THE MULTI-PRONGED TEST REGARDING RECEIVERSHIP WEIGHS AGAINST CONSIDERATION OF APPOINTING A RECEIVER

The decision whether to appoint a receiver is a function of the court's discretion in evaluating what is reasonable under the particular circumstances of the case. *Plata v. Schwarzenegger*, No. C01-1351 TEH, 2005 U.S. Dist. LEXIS 43796 (Oct. 3, 2005)(*citing Dixon*, 967 F.Supp. 535, 550 (D.D.C. 1997); 12 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2983 (2005)). Courts have developed the following multi-pronged test to guide the drastic decision of receivership, the first two elements are given predominant weight:

> (1) Whether there is a grave and immediate threat or actuality of harm to plaintiffs;
> (2) Whether the use of less extreme measures of remediation have been exhausted or prove futile;
> (3) Whether continued insistence that compliance with the Court's orders would lead only to confrontation and delay;
> (4) Whether there is a lack of leadership to turn the tide within a reasonable period of time;
> (5) Whether there is bad faith;
> (6) Whether resources are being wasted; and
> (7) Whether a receiver is likely to provide a relatively quick and efficient remedy.

*See Dixon*, 967 F.Supp. at 550; *District of Columbia v. Jerry M.*, 738 A.2d 1206, 1213 (D.C.Ct. App. 1999)(reversing appointment of receiver based on trial court's consideration of only the single factor of defendant's historical failure to comply with court mandates).

#### a. Threat of Harm

In *Plata v. Schwarzenegger*, the Court ordered receivership because, *inter alia*, it was undisputed that a prisoner died every six to seven days because of the prison's gross failures of the medical delivery system. 2005 U.S. Dist. LEXIS 43796, No. C01-1351 TEH, (N.D.Cal. Oct. 3, 2005), at *3. Importantly, the State saw itself as incapable of handling the crisis and no degree of

support or coercion was likely to help. *Id.* at *81.  The unconscionable degree of prisoner suffering and death, coupled with the uncontested appointment of a receiver, warranted receivership.  *Id.*

This case, however, is distinguishable from *Plata*.  Defendants are capable and, as outlined above, are employing measures to attain compliance.  Prisoners at the St. Thomas jail are not subject to grave harm and Defendants are implementing measures to address care for the mentally ill prisoners.

### b.   Whether the Use of Less Extreme Measures of Remediate Have Been Exhausted or Proved Futile

In fashioning an appropriate remedy, the Court must exercise restraint, using the least possible power adequate to the remediation of constitutional violations. *See, e.g., Missouri v. Jenkins*, 495 U.S. 33, 51, (1990) (before intruding on local authority, district court must assure itself that no lesser alternatives are adequate to the task).  Under the Prisoner Litigation Reform Act, all prospective judicial relief (including the appointment of a receiver) must be accompanied by findings that the relief is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."  18 U.S.C. § 3626(a)(1)(A).

Defendants have not been held in contempt since 2007, D.E. 502, and posit that the Court's contempt power has not been fully exhausted.  The Court's August 21, 2015 Order, D.E. 833, requiring quarterly evidentiary hearings and that Defendants have consistently achieved most of the set quarterly goals further exemplifies that less extreme measures would not be futile.

### c.   WHETHER CONTINUED INSISTENCE THAT COMPLIANCE WITH THE COURT'S ORDERS WOULD LEAD ONLY TO CONFRONTATION AND DELAY

By Order dated August 21, 2015, the Court amended the parties' 2013 Settlement Agreement by requiring the establishment of meaningful and achievable quarterly goals and evidentiary hearings. D.E. 833.  This has resulted in measureable progress towards full compliance

each quarter.  Illustrative to this point is Mr. Bogard's quarterly report, in which he stated, that "I believe that there is new momentum on the part of the defendants . . . . [ ], the Court's decision to require the establishment and monitoring of quarterly goals has clearly resulted in a flurry of compliance directed activity that I have not witnessed previously."  Assessment of Quarterly Security & Fire Safety Goals, Nov. 2015, D.E. 855-1 at 10.  Therefore, the Court's orders have real, positive effects on Defendants' compliance measures negating the need to consider receivership.

### d.  WHETHER THERE IS A LACK OF LEADERSHIP TO TURN THE TIDE WITHIN A REASONABLE PERIOD OF TIME

The Government and the in particular, the Bureau of Corrections, is under new leadership and must be afforded the opportunity to comply with the 2013 Settlement Agreement.  In all fairness, Plaintiffs and the Court should recognize that the current administration inherited many of the identified problems at the Jail from the past administrations.  Director Testamark began her leadership of the Bureau of Corrections on February 11, 2019.  She has over 29 years of correctional and management experience.  Director Testamark's first bold, direct and deliberate act towards compliance and improving constitutional conditions is the conversion of the mental health housing unit from an indirect supervision model to a direct supervision model.  This shows dedication to tackle the difficult task of addressing Jail's deficiencies.

### e.  WHETHER THERE IS BAD FAITH

Defendants' outlined compliance efforts and achievement of quarterly goals demonstrate that there is no bad faith.  Rather, there is a commitment to attain compliance.

### f.  WHETHER RESOURCES ARE BEING WASTED

Waste of resources has not been an identified problem in this case since 2013 and it remains a non-issue.  In addition to Defendants' budget, Defendants are continually seeking grants and

assistance from the National Institute of Corrections and other corrections professional organizations to support compliance measures.

### g. WHETHER A RECEIVER IS LIKELY TO PROVIDE A RELATIVELY QUICK AND EFFICIENT REMEDY

The simple answer is no. Reform of the jail requires extensive correctional experience, understanding of the inter-play between the governmental agencies regarding funding, hiring, and procurement, limited access to on-line services, expertise, materials, and supplies, an appreciation of Virgin Islands culture, an understanding of the financial and budgetary factors, which were impacted by the 2017 hurricanes, and the ability to navigate the branches of government. This will not be quick. The issues that hinder expedient compliance with the 2013 Settlement Agreement are unique to the Virgin Islands. For example, a noted impediment towards compliance is the difficult to recruit corrections officers. Forty-four corrections officers must be hired to safely operate the jail, based on its current design, according to the 2014 Staffing Analysis. While Defendants aggressively recruit through job fairs, online and radio advertisements, recruitment is difficult because many interested applicants reside in the mainland and simply do not want to relocate. St. Thomas is a small island, far from the contiguous United States, threatened by hurricanes every season, with a distinct culture and identity. A receiver is unlikely to successfully reform the jail.

### VII.   CONCLUSION

For the foregoing reasons, consideration of receivership is drastic and unwarranted.

Respectfully submitted,

**DENISE GEORGE-COUNTS, ESQ.**
**ATTORNEY GENERAL DESIGNEE**

April 15, 2019                **BY:**      */s/ Shari N. D'Andrade*_____
                                    **SHARI N. D'ANDRADE, ESQ.**

**SPECIAL ASSISTANT ATTORNEY GENERAL**
V.I. Bar. No. 1221
V.I. Department of Justice
Office of the Attorney General
6040 Estate Castle Coakley
Christiansted, VI 00820
Telephone: (340) 773-0295
Fax: (340) 773-1425
Email: shari.dandrade@doj.vi.gov


## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2019, I electronically filed a true copy of the foregoing

**COURT-ORDERED BRIEF REGARDING CONSIDERATION OF RECEIVERSHIP** with

the Clerk of the Court using the CM/ECF system, which gives notification of such filing (NEF) to

the following:


Eric Balaban
National Prison Project of the ACLU
915 15th Street, N.W., 7th Floor
Washington, DC 20005
Telephone: (202) 393-4930
Fax: (202) 393-4931
Email: ebalaban@npp-aclu.org

Carol Thomas-Jacobs
Virgin Islands Department of Justice
Office of the Attorney General
8050 Kronprindens Gade
St. Thomas, VI 00802
Telephone: (340) 774-5666
Fax: (340) 776-3493
Email: cjacobs@doj.vi.gov

*/s/ Shari D'Andrade*