DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| LAWRENCE CARTY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil No. 1994-78 |
| v. | ) | |
| | ) | |
| ALBERT BRYAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

ATTORNEYS:
**Eric Balaban**
National Prison Project of the ACLU
Washington, DC
    *For the plaintiffs,*

**Denise George, Attorney General**
**Kevin L. Vidale, Special Assistant Attorney General**
**Carol Thomas-Jacobs, AAG**
Virgin Islands Department of Justice
St. Thomas, VI
    *For the defendants.*

<u>ORDER</u>

**GÓMEZ, J.**

    In 1994, Lawrence Carty and other similarly situated prison
inmates (collectively "Carty") in the custody of the Virgin
Islands Bureau of Corrections in St. Thomas, Virgin Islands,
instituted this action against the Governor of the Virgin
Islands; the Director of the Virgin Islands Bureau of
Corrections; the Warden and Acting Assistant Warden of the
Criminal Justice Complex; the Virgin Islands Bureau of
Corrections ("BOC"); and the Attorney General of the Virgin

*Carty v. Bryan*
Civ. No. 94-78
Order
Page 2

Islands (collectively the "Government of the Virgin Islands" or
the "GVI" or the "Virgin Islands"). Carty alleged that
conditions at the Criminal Justice Complex ("CJC") and Criminal
Justice Complex Annex ("CJC Annex"), the St. Thomas correctional
facilities of the BOC, which house inmates, violated the United
States Constitution.

On October 12, 1994, the parties entered into a settlement
agreement. That settlement, which was approved by the Court, was
incorporated into a judgment of the Court (the "Original Consent
Decree"). The Original Consent Decree sets forth various reforms
designed to remedy the unconstitutional conditions found within
the St. Thomas correctional facilities. Specifically, the Virgin
Islands was required to implement certain reforms regarding
medical treatment, use of force, prisoner classification, and
security, among others.

The underlying deficiencies at the Bureau of Corrections
that gave rise to this case largely have remained unresolved for
over twenty-five years. Indeed, the Court has found the Virgin
Islands in contempt of the Original Consent Decree and its
orders enforcing the Original Consent Decree four times. *See*
*Carty v. DeJongh*, 2007 WL 817607 (Feb. 27, 2007); Findings of
Fact and Conclusions of Law on Contempt Motion, *Carty v.*
*Turnbull*, Civil No. 94-78 (D.V.I. May 28, 2003), ECF No. 394;

*Carty v. Bryan*
Civ. No. 94-78
Order
Page 3

*Carty v. Turnbull*, 144 F. Supp. 2d 395 (D.V.I. 2001); *Carty v. Farrelly*, 957 F. Supp. 727 (D.V.I. 1997).

In 2013, the Virgin Islands continued to struggle to comply with the terms of the Original Consent Decree. In light of those struggles, the parties entered into a new settlement agreement which superseded all prior settlement agreements and remedial orders in this matter. That settlement, which was approved by the Court, was incorporated into a judgment of the Court (the "2013 Amended Consent Decree"). The 2013 Amended Consent Decree maintains many of the remedies set forth in the Original Consent Decree and adds new substantive remedies.

The Court's review of the GVI's efforts to achieve substantial compliance with the 2013 Amended Consent Decree has yielded largely disappointing results. Indeed, in August, 2015, the Court amended the 2013 Amended Consent Decree (that amendment is referred to herein as the "2015 Amendment") in an effort to encourage compliance. *See* Order, August 21, 2015, ECF No. 833. In the 2015 Amendment, the Court observed that, in the intervening two years between entry of the 2013 Amended Consent Decree and the 2015 Amendment, the Virgin Islands had failed to take any action to obtain substantial compliance with the 2013 Amended Consent Decree. *Id.* at 2. Given those circumstances, the Court ordered the parties to set quarterly goals that would

*Carty v. Bryan*
Civ. No. 94-78
Order
Page 4

meaningfully advance the Virgin Islands toward substantial

compliance with the 2013 Amended Consent Decree. *Id.* at 4. The

Court also set a schedule of quarterly evidentiary hearings at

which the parties would report on the progress of the Virgin

Islands toward achieving substantial compliance with the 2013

Amended Consent Decree. *Id.*

Since the August 21, 2015, order, the Court has held 17

quarterly hearings in this matter. At those hearings, the Court

has received evidence as to current conditions at the CJC and the

CJC Annex[1]. The Court received evidence from both parties. The

Court also heard testimony from the court-appointed experts in

this case, various BOC Directors, the Warden, CJC and BOC staff,

the Director and Assistant Director of the Virgin Islands

Department of Health ("DOH"), and personnel from the Schneider

Regional Medical Center ("SRMC"). The Court has also received

evidence through expert reports and the parties' quarterly

status reports.

The totality of the evidence has consistently demonstrated

that the Virgin Islands continues to remain out of compliance

with the terms of the 2013 Amended Consent Decree. For example,

amongst other failures, the evidence has shown that, with

respect to the CJC, the Virgin Islands consistently fails to

---

[1] The CJC Annex has been closed since Hurricanes Irma and Maria struck the territory in 2017.

*Carty v. Bryan*
Civ. No. 94-78
Order
Page 5

adequately supervise prisoners, remedy security hazards,
implement contraband policies designed to eliminate the presence
of dangerous material, investigate instances of contraband
introduction, investigate and discipline instances of alleged
excessive use of force by correctional officers, provide
adequate staffing to ensure the safety and security of
prisoners, and provide adequate mental health treatment to
prisoners. Moreover, while the Virgin Islands has made minor
steps toward compliance with the 2013 Amended Consent Decree
each quarter, it has also consistently failed to meet deadlines
for achieving the established quarterly goals. In several
instances, the Virgin Islands failed to achieve goals repeatedly
set, and re-set, through multiple quarters. The Virgin Islands's
failure to meet deadlines and make meaningful progress toward
substantial compliance with the 2013 Amended Consent Decree is
not novel. Rather, the Virgin Islands's non-compliance has
become a pattern and practice.

On August 1, 2019, the Court held a status conference with
the parties. At that conference, the parties discussed how the
Virgin Islands could make meaningful, tangible inroads toward
obtaining substantial compliance with the 2013 Amended Consent
Decree. Thereafter, the Court ordered the court-appointed experts
in this case to submit plans that would outline specific,

*Carty v. Bryan*
Civ. No. 94-78
Order
Page 6

demonstrable, and tangible tasks necessary to be undertaken to obtain substantial compliance with the provisions of the 2013 Amended Consent Decree. The experts submitted plans containing a number of tasks.

On September 30, 2019, the Virgin Islands filed a plan proposing specific, demonstrable, and tangible tasks necessary to be undertaken to obtain substantial compliance with the 2013 Amended Consent Decree. *See* ECF No. 1169. In its plan, the Virgin Islands adopted a number of the tasks proposed by the court-appointed experts. The Virgin Islands determined several tasks could be achieved within the proposed timeframes. The Virgin Islands also proposed a number of other tasks.

Given the continuing non-compliance of the Virgin Islands with the mandates of the 2013 Amended Consent Decree, the Court finds that it must exercise its compliance enforcement power to ensure current and future compliance. The Court does not make that finding in a vacuum. Rather, the Court is mindful that its previous efforts to spur the Virgin Islands to comply with the 2013 Amended Consent Decree have not achieved their desired result.

## **CONCLUSION**

Ordinarily, when a Court enters judgment, the expectation is that it resolves all pending matters in a case and that the

*Carty v. Bryan*
Civ. No. 94-78
Order
Page 7

parties will comply with the Court's mandate. That ordinary
expectation has been confounded by the serial non-compliance in
this case.

The Original Consent Decree was entered in 1994. Compliance
was expected. What followed instead were multiple contempt
findings. Indeed, non-compliance has been so entrenched that the
parties undertook the unusual step of entering a second
settlement agreement *after* the entry of the Original Consent
Decree in this matter to resolve matters that were presumed to
have been resolved 19 years earlier. That step was prompted by
this Court's May 17, 2010, order which concluded that, after
sixteen years, the Virgin Islands "must once and for all resolve
the deficiencies swiftly and fully." *Carty v. DeJongh*, No. 94-
78, 2010 U.S. Dist. LEXIS 48980, at *13-14 (D.V.I. May 17,
2010). Further, the Court encouraged the parties to propose a
remedial order that would correct all continuing injustices and
establish a time-frame for final termination of the Court's
jurisdiction. *Id.* As such, the 2013 Amended Consent Decree was
designed to have the salutary effect of forestalling yet another
contempt finding and severe sanctions. That desired effect has
been frustrated.

To its credit, the Virgin Islands has undertaken some
efforts to improve the maladies that afflict the BOC. The

*Carty v. Bryan*
Civ. No. 94-78
Order
Page 8

current leadership has indicated a renewed commitment to improve. Yet, structural and institutional deficiencies persist and dampen any enthusiasm for the long sought compliance and improvement. In the wake of multiple decades of a glacial pace towards compliance, many have continued to suffer injury. The Court has received evidence of prison cell arson; attacks on inmates, by both other inmates and correctional officers; the rape of inmates; suicide; correctional officers sleeping on shift; falsified unit log records; and other serious breaches threatening the safety and security of BOC inmates.

The sad and tragic plight of those afflicted with mental illness who are consigned to the BOC provides yet another vivid example of why something more than an additional exhortation, added to the decades of exhortations from the Court to do better, is required. Indeed, the record in this case is replete with an abundance of stories of inmates who suffer from mental illness:(1) being deprived of any clear pathway to meaningful treatment; (2) being locked away with justice a delayed and distant apparition; (3) being shuttled to, and rejected by, the hospital; or (4) enduring each of these experiences.

Clearly, the time has come for a more comprehensive and binding remedial measure. At the same time, the Court appreciates that with any remedy imposed by the Court, given the

*Carty v. Bryan*
Civ. No. 94-78
Order
Page 9

current circumstances, some grace is appropriate. Accordingly,

the Court will stagger and delay the deadlines by which the GVI

must remedy its outstanding deficiencies.

　　　The premises considered, it is hereby

　　　**ORDERED** that the BOC shall implement the following near-term

remedial provisions within 90 days of the date of this order[2]:

　　　Near-Term Remedial Provisions:

　　　　a.　Develop an audit mechanism to self-monitor, identify
and correct problems or deficiencies in meeting
timeframes for mental health care screening, including
completeness of screening (completeness of forms,
names and signatures of persons completing the
screening, date and time of screening), timeliness of
referrals for mental health assessment, and diversion;

　　　　b.　Complete the contracting process with the psychiatrist
to review any appeals to the involuntary medication
process and provide training to him/her on the policy
and procedure;

　　　　c.　Procure direct admission to Schneider Regional Medical
Center ("SRMC") for an inpatient bed for 24-hour
admission to permit comprehensive assessment and
treatment recommendations to assist in stabilizing the
patient upon return to CJC at the conclusion of the
hold or lead to a longer acute inpatient stay if
necessary;

　　　　d.　Create a record (paper, electronic, or both)
containing all policies, procedures, and
administrative directives that have been developed and
implemented as well as any that are in place but have
not been revised in order to make all of them readily
available to all staff for reference and to identify
any policies that must be revised or created to fill
any gaps;

---

[2] The terms used in this order shall have the same definitions as those
provided in the 2013 Amended Consent Decree. *See* Amended Consent Decree at
1-3, ECF No. 765-1.

*Carty v. Bryan*
Civ. No. 94-78
Order
Page 10

e. Create an initial list of all mental health and
   security policies required by the 2013 Amended Consent
   Decree;

f. Begin self-audits of suicide prevention policy to
   include assessment of compliance with policy and
   procedure (timely transfer to hospital for inpatient
   care, housing in safe cell at Golden Grove Adult
   Correctional Facility ("GGACF"), appropriate
   monitoring and log documentation, assessments and
   follow-up) and corrective action measures taken to
   address any lapses in application;

g. Discontinue use of lock-down status for inmates with
   serious mental illness except in an emergency situation
   and then, for the shortest time possible;

h. Review mental health services policy and update it to
   reflect changes in procedures and practices as a
   result of other updated policies and levels of care
   including direct admission to SRMC for comprehensive
   assessment, transfers to GGACF for suicide watch/safe
   cell placement, and procedures to access intermediate
   and longer-term care;

i. Complete refresher training for all staff on the
   hospital security policy and the duties of staff
   assigned to guard CJC prisoners at SRMC;

j. Develop and implement a system to track the timeliness
   of referred prisoners' access to acute stabilization
   and inpatient or intermediate mental health care
   including prisoner name, level of care to which he/she
   was referred, the date of referral to higher level of
   care, the date accepted (or denied) for transfer to
   higher level of care, the number of days waiting for
   admission/transfer, and date of eventual transfer.
   Increase communications with other stakeholders (SRMC,
   Department of Health) to ensure timely hospitalization
   of CJC patients requiring acute, residential, or
   inpatient treatment;

k. File a report updating the status of all prisoners who
   have been transferred to the Correct Care/Wellpath
   facility in South Carolina, or otherwise hospitalized
   for long-term mental health treatment, since January
   2019. The report shall be in the same format as the

*Carty v. Bryan*
Civ. No. 94-78
Order
Page 11

BOC's last report, ECF No. 1070: identifying each prisoner by their initials and providing information on developments in their pending criminal cases since January 2019. The report shall indicate the current location/housing of each identified prisoner;

l. Continue to conduct monthly audits of 10 randomly selected files focused on intake screening. Implement any plans of correction required to address any deficiencies identified;

m. Continue to conduct monthly searches/shakedowns of all common spaces (excluding clusters and associated dayrooms) as per AD 2015-11 Contraband Control;

n. Implement Use of Force/Video Recording Devices policy for all planned uses of force according to Policy BOC-SEC-1004H;

o. Revise the schedule and parameters for evacuation drills;

p. Report on the status of hiring goals as per the report BOC submitted in August 2018, and file updates thereafter at 6 month intervals;

q. Complete development and implementation of the Mail policy for the CJC, to include processes for inspection of prisoner mail and packages for contraband, as per AD-2015-11 Contraband Control;

r. Train staff on the Prison Rape Elimination Act ("PREA") policy;

s. Fully implement the practice of consulting with and involving mental health staff in attempts to de-escalate potential use of force incidents involving mentally ill prisoners when feasible, as per umbrella Use of Force policy BOC-SEC-1004;

t. Procure and maintain sufficient numbers of functional, industrial grade portable radios for use by assigned housing unit staff and other security posts on all shifts as appropriate for safe and secure operations;

u. Procure and maintain a sufficient number of self-contained breathing apparatuses ("SCBAs") for use by assigned housing unit staff and other security posts

*Carty v. Bryan*
Civ. No. 94-78
Order
Page 12

> on all shifts as appropriate for safe and secure operations;
>
> v.  Complete installation of a CCTV system that provides full coverage of all areas of the CJC up to and including the security perimeter;

it is further

**ORDERED** that the BOC shall implement the following mid-term remedial provisions within 180 days of the date of this Order:

Mid-Term Remedial Provisions:

> a.  Develop a schedule of implementation of all policies required by the 2013 Amended Consent Decree, including dates by which each policy will be finalized, and staff trained on them, within 18 months after the schedule is developed. The plan shall provide for stages by which identified policies will be finalized and staff trained (policies completed and staff trained in 90 days, 6 months, 9 months, 1 year, and 18 months). The schedule shall also provide for annual review of all policies for necessary revision, and for periodic retraining as necessary;
>
> b.  Require completion of a comprehensive mental health assessment of each new inmate by a psychiatric provider within 3 days of admission. Audit 10 charts monthly to assess compliance with the 3-day time frame;
>
> c.  Fully implement the Psychotropic Medication policy which was revised in the spring of 2017;
>
> d.  Fully implement the Emergency and Involuntary Medications policy;
>
> e.  Develop an audit tool to assess compliance with the policy requirements of the psychotropic medication policy. Audit 10 charts randomly selected monthly. (This must be done by a physician familiar with the policy requirements.);

*Carty v. Bryan*
Civ. No. 94-78
Order
Page 13

f.  Use the audit instrument developed for the involuntary medication policy to review any involuntary medication hearings conducted;

g.  Provide initial suicide prevention training to new staff (custody, mental health, medical);

h.  Develop and conduct an annual refresher training on suicide prevention for all staff;

i.  Continue self-audits of compliance with suicide prevention program;

j.  Create an audit instrument to assess compliance with the terms of the inmate discipline policy including review and consultation with mental health staff prior to imposition of a disciplinary sanction in addition to the other disciplinary policy provisions. Self-monitor to identify and correct any problems or deficiencies in meeting policy requirements;

k.  Track the timeliness of referred inmates' access to acute stabilization and inpatient or intermediate care including inmate name, level of care to which he/she was referred, the date of referral to higher level of care, the date accepted (or denied) for transfer to higher level of care, the number of days waiting for admission/transfer, and date of eventual transfer;

l.  Develop and implement a policy that addresses CJC armory operations and weapons, and train appropriate staff on the same, consistent with the umbrella Use of Force Policy BOC-SEC-1004;

m.  Initiate the practice of conducting authorized random searches of at least two security, programs, services, and/or administrative staff during the 8AM-4PM shift or the 4PM-12AM shift, as per AD-2015-11 Contraband Control. Provide documented evidence of this practice;

n.  Implement the Tool and Equipment control policy;

o.  Finalize a Key Control policy;

p.  Develop and implement policy and procedures that address the operation, function, inspection, testing, and maintenance of locks and locking devices, and all security systems at the CJC, including those for all

*Carty v. Bryan*
Civ. No. 94-78
Order
Page 14

doors, gates, sally-ports, control panels, pass-through ports, secure storage lockers, etc.;

q. Develop a standardized form that will be used to specify and document conditions of confinement and applicable security and safety protocols for prisoners placed on authorized lockdown status(es), as per AD-2015-3 Pre- Hearing Detention and Related Lockdowns;

r. Develop and implement a documented program of accountability measures, including but not limited to progressive discipline and/or retraining, for staff who violate policies, post orders, practices, code of conduct, fail to cooperate with administrative or criminal investigations processes, and/or who engage in other performance failures specified in the 2013 Amended Consent Decree and applicable collective bargaining agreements;

s. Institute thorough reviews and subsequent training for staff regarding incidents involving misconduct even if disciplinary measures against offending officers cannot be instituted;

it is further

**ORDERED** that the BOC shall implement the following long-term remedial provisions within 18 months of the date of this order:

Long-Term Remedial Provisions:

a. Review medical and mental health policies to ensure compliance with the current NCCHC Standards for Health Services in Jails;

b. Revise/update medical and mental health policies as required by the 2013 Amended Consent Decree and begin to review annually;

c. Provide training to newly hired mental health staff person to include policies, procedures, and a period of on-the-job training;

d. Retain a joint medical expert per the procedures under the 2013 Amended Consent Decree, ECF No. 765-1;

*Carty v. Bryan*
Civ. No. 94-78
Order
Page 15

e. Fill all required positions so as to satisfy 95% of post requirements without the use of double shifts and overtime, and obtain budgetary permission to overfill positions so as to not dip below authorized levels;

f. Finalize and implement post orders for all remaining security posts;

g. Repair and/or replace inoperable drinking fountains within affected clusters;

h. Purchase a sufficient number of portable metal detectors (wands) for the purpose of assigning one to each cluster control booth's inventory, which should be used by staff to augment pat down searches of prisoners for contraband in conjunction with their participation in activities such as programs, services, court appearances and other appointments outside the CJC, shakedowns, etc., as per AD-2015-11 Contraband Control;

i. Establish adequate logs to consistently document practice related to ensuring the right of prisoners to access the courts—including legal phone calls, legal visits and tele-visits with their attorney/authorized representative, legal correspondence, an adequately stocked library with relevant legal materials, and the provision of adequate assistance from trained personnel;

j. Complete development of an associated job description for each position, including but not limited to those security, support, and administrative personnel who are not assigned to a post;

k. Continue to develop and implement use of forms, logs, and logbooks as required by the 2013 Amended Consent Decree;

l. Continue to develop and maintain the capacity to implement all other 2013 Amended Consent Decree requirements related to limits for cell occupancy, parameters for facility lockdowns in excess of 72 hours, adequate numbers of cells for prisoner population under segregation status(es), outdoor recreation opportunities, and isolation of new admissions pending medical clearance;

*Carty v. Bryan*
Civ. No. 94-78
Order
Page 16

       m. Continue to periodically update the facility's
          prisoner handbook that is provided to all prisoners
          during the new admissions process;

it is further

    **ORDERED** that immediately upon completion of a near-term, mid-term, or long-term remedial provision set forth herein, the GVI shall file a notice on the ECF system identifying the specific near-term, mid-term, or long-term remedial provision and certifying the GVI's compliance with that remedial provision; it is further

    **ORDERED** that no later than 7 days after the GVI files its certification of complying with a specific near-term, mid-term, or long-term remedial provision, Carty shall file any objections thereto; it is further

    **ORDERED** that if the Court determines that the GVI has failed to abide by a near-term, mid-term, or long-term remedial provision set forth herein, the GVI shall pay $100 per day per remedial provision for each day of non-compliance up to 14 days; that is, up to a maximum amount of $1400. If non-compliance persists after 14 days, the GVI's payment shall increase to $500 per day per remedial provision for each additional day of non-compliance up to 28 days; that is, up to a maximum amount of $14,000 in addition to the $1400 previously accrued. After 42 days of non-compliance, the GVI shall pay $1,000 per day per remedial provision for each additional day of non-compliance;

*Carty v. Bryan*
Civ. No. 94-78
Order
Page 17

that is, in addition to the $15,400 previously accrued; it is

further

**ORDERED** that all monies paid by the Virgin Islands pursuant

to this order shall be deposited into the remedial fund

established by the Court by its October 29, 2001, order and May

28, 2003, order which were incorporated into the 2013 Amended

Consent Decree. Disbursements from such remedial fund shall be

limited to BOC operations with priority given to expenditures

mandated by all consent decrees, orders, and judgments

addressing conditions at the BOC facilities in this matter.


S\_____
                                        **Curtis V. Gómez**
                                        **District Judge**